**UNITED STATES of America**

v.

**Herbert FINEMAN.**

**Crim. No. 77–36.**

United States District Court,
E. D. Pennsylvania.

June 2, 1977.

Alan M. Lieberman, Asst. U. S. Atty., Philadelphia Pa., for plaintiff.

Howard Gittis, Wolf, Block, Schorr and Solis-Cohen, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

In a ten-count Indictment returned January 28, 1977, the defendant Herbert Fineman, then Speaker of the House of Representatives of the Pennsylvania General Assembly, was charged with violations of the Racketeer Influenced and Corrupt Organizations Statute, 18 U.S.C. § 1962(c), conspiracy, mail fraud, interference with a federal investigation, and obstruction of justice, all in connection with the alleged receipt of bribes for the use of his official influence to obtain favorable action upon applications for admission to certain graduate schools of state-supported universities.

The jury trial commenced May 9, 1977. Two counts of the Indictment were dismissed at the close of the Government's case. On May 20, 1977, the jury rendered its verdict, finding the defendant guilty on two counts of obstruction of justice, and not guilty on all remaining counts. Post-trial motions challenging the convictions were argued on May 31, 1977.

The RICO, conspiracy, and mail fraud counts rejected by the jury were based upon allegations that, on at least four occasions between 1970 and 1973, parents of students desiring to enroll in certain medical and veterinary schools paid large sums of money to one Martin Abrams, in order to obtain favorable action on the respective applications. The parents did not know what was to become of the money, except that it would be returned to them if the student in question was not admitted to the particular graduate school. Abrams testified that he paid most of the money to the defendant. The defendant denied ever receiving any money from Abrams or anyone else in connection with such applications. While admitting that, in each of the four instances, the defendant or some member of his staff had written a letter of recommendation to the graduate school in support of the application, the defense produced evidence to the effect that literally hundreds of such letters were written by the defendant or his staff, and that many other members of the legislature also wrote such letters, as a routine service to their constituents. The Government sought to establish that, in cases where the Government claimed the defendant was being paid, the letters of recommendation differed from the routine letters in their form, content, tone, or distribution.

However, the only direct evidence of payment to the defendant in these cases was the testimony of Abrams. When Abrams was first called before the Federal Grand Jury, he pleaded the Fifth Amendment. After being granted testimonial immunity, Abrams initially denied receiving any money from any of the parents, whereupon he was indicted for perjury, and entered a guilty plea to that charge. As part of a plea arrangement for a probationary sentence, and after being placed in a witness protection program because of alleged

threats unconnected to the present case, Abrams again went before the Grand Jury, implicating the defendant and others, and testified as a Government witness at the defendant's trial. The reliability of his testimony was further undermined by his free-wheeling admissions to a number of other criminal offenses, including bribery not involving the defendant, income tax evasion, false income tax returns, etc.; and by the fact that for several years he had enjoyed a standard of living involving expenditures seemingly in excess of his relatively modest earnings from legitimate pursuits.

The Government sought to bolster Abrams' credibility in this instance by proof of a conversation, recorded without Abrams' knowledge before he decided to cooperate with the Government, between Abrams and one Gagliardi, who was acting as a Government informant. In the course of that conversation, Abrams told Gagliardi that the defendant had been the recipient of large sums of money in connection with graduate school admissions, and discussed ongoing arrangements whereby the defendant was paying Abrams' legal fees.

In late March of 1976, the local office of the Federal Bureau of Investigation received a "tip" concerning Fineman's alleged involvement with medical school admissions. This information was turned over to the Office of the Special Prosecutor, a state agency which was then conducting an investigation of the matter. So far as the record discloses, there was no federal investigation until some time in June or July of 1976.

The defendant's convictions on Counts IX and X of the Indictment stemmed from his activities during 1976, when, according to the Government, he attempted to conceal from the Federal Grand Jury his involvement with the questioned transactions. In Count IX, the defendant was charged with causing a vice-president of the University of Pennsylvania, in August of 1976, to remove from the files and destroy a letter of recommendation written by the defendant on behalf of an applicant named Braunstein for admission to that university's School of Veterinary Medicine. In Count X, the defendant was charged with having, on various dates in November and December of 1976, urged one Harold Salkind, who had been subpoenaed to testify before the Federal Grand Jury, to withhold information from the Grand Jury concerning certain transactions involving admissions to the Philadelphia College of Osteopathic Medicine. The evidence as to each of these counts will now be summarized briefly:

As to Count IX, there was evidence from Abrams to the effect that he initially agreed not to implicate Fineman in exchange for the defendant's payment of Abrams' legal fees, and in the hope that the defendant would enable Abrams to "better himself" in the years ahead; and that he kept the defendant informed as to the nature of the Grand Jury's inquiries. The defendant, on the other hand, testified that his interpretation of his conversations with Abrams was that Abrams was threatening to implicate the defendant (falsely) unless the defendant paid $5,000 for Abrams' legal fees; that he refused to make any such payment; but that, as a result, he felt vulnerable to adverse publicity in the event Abrams carried out his veiled threats. Abrams had mentioned the names of two of the students, Conti and Braunstein, whose parents had paid Abrams large sums of money, and told the defendant that he, the defendant, was "involved" since he had written letters of recommendation for these men. The defendant thereupon promptly checked his office records, but could find no reference to Braunstein. He then asked his friend, E. Craig Sweeten, Vice-President of the University of Pennsylvania, to have the files of the veterinary school checked to see whether there was any such letter. Mr. Sweeten testified that the defendant met with him, told him that if there was a sponsoring letter for Braunstein it could be exceedingly embarrassing to the defendant, and requested Sweeten to cause any such letter to disappear, or words to that effect.

The defendant denied having expressly requested Sweeten to destroy the letter. He stated his primary purpose was to as-

**201**

certain whether or not there was such a letter. He admitted, however, that he was in a state of panic and "anguish;" that he emphasized to Mr. Sweeten how very embarrassing such a letter might prove to be if it existed; that he does not know what he would have said if the existence of such a letter had been confirmed; and that he can readily understand that Mr. Sweeten may have interpreted the defendant's words and facial expression as constituting a request for the destruction of the letter if found. The defendant admitted receiving word from an associate of Sweeten a few days later that the Braunstein matter had been "taken care of" but said he interpreted that as meaning that no letter had been found.

As it happened, the letter in question, which was in a rather forceful vein, was written on behalf of two students, Braunstein and a relative of the defendant. As a result of Mr. Sweeten's intervention at the defendant's request, the copy of the letter was removed from the Braunstein file and destroyed, but the original remained in the file of the other student, and was ultimately produced before the Federal Grand Jury in response to a subpoena, at which time the removal of the copy from the Braunstein file came to light.

With respect to Count X, there was evidence that one Harold Salkind, an accountant and a "consultant" to the President of the Philadelphia College of Osteopathic Medicine had, over a period of years, been active in obtaining large "donations" to the college from parents of students seeking admission there. He testified that he had channeled upwards of $200,000 to Dr. Barth, the deceased former president of the college, in this manner, and had kept upwards of $75,000 for himself over the years. He testified that he was friendly with the defendant's father, and also with the defendant, and that on two occasions in 1967 and 1968, the defendant had been involved in such transactions. Salkind further testified that on both occasions, pursuant to

arrangements suggested by Dr. Barth, the defendant delivered to Salkind substantial sums of cash, on behalf of the parents of prospective students, and that in response to Salkind's inquiries, the defendant stated that he himself already had been "taken care of." [1] In addition, there was evidence of Salkind's involvement with more recent transactions with Abrams (but a dispute in the evidence as to how much money each man received). In late March of 1976, Salkind was subpoenaed to appear before a State Grand Jury. He mentioned that fact to the defendant during a chance encounter, and told the defendant that he planned to assert his Fifth Amendment privilege.

The new president of the Philadelphia College of Osteopathic Medicine, Dr. Rowland, testified that shortly thereafter the defendant asked him to obtain a list of students at the college for whom the defendant had written letters of recommendation. The defendant came to Rowland's office to obtain the list, and requested Rowland to destroy all such letters of recommendation from the defendant. According to Rowland, over a period of two or three months thereafter, Salkind, on several occasions, relayed to Rowland the defendant's request that these letters be destroyed, and sought assurance that they had been destroyed.

The defendant, in his testimony, admitted the visit to Dr. Rowland and the request for destruction of his letters (although he was under the impression that there was only one such letter). According to the defendant, about a week after his conversation with Salkind, he wrote another letter of recommendation for an applicant to the Philadelphia College of Osteopathic Medicine, but upon reflection, immediately thereafter concluded that any public official whose name might be linked to Salkind's activities would be the target of unfavorable publicity. He thereupon attempted to protect himself from that eventuality by asking that any letters from him be re-

1. As discussed in Part II below, these transactions were not the subject of any of the counts of the Indictment in this case.

moved from the college files and destroyed. It should be noted that the defendant was initially charged, in Count VI of the Indictment, with obstructing a federal investigation in violation of 18 U.S.C. § 1510, by reason of these activities; but that charge was dismissed because of the Government's inability to prove that there was an actual federal investigation at the time the letters were destroyed.

At a social gathering in November of 1976, Salkind told the defendant that he had been summoned before a Federal Grand Jury, and was to be granted immunity; and that he intended to tell the complete truth, including revelation of the defendant's involvement in the 1967–68 transactions. On several occasions thereafter, according to Salkind, the defendant pleaded with him to omit from his testimony any reference to the defendant. It was these efforts which led to the defendant's conviction on Count X.

In his testimony, the defendant admitted urging Salkind to "keep me out of it," but only because any such testimony by Salkind would have been utterly false. It was the defendant's position that Salkind was proposing to furnish untrue testimony concerning the defendant in order to assure himself of immunity from prosecution.

## I. *Motion in Arrest of Judgment*

■ The defendant seeks dismissal of Count IX on the ground that, while the evidence was sufficient to permit a reasonable jury to conclude that the defendant corruptly sought and obtained the destruction of the Braunstein letter, it is clear from the record that, at that time, the Braunstein file had not been subpoenaed by the Grand Jury. I perceive no merit to this argument. A person who knows that a Federal Grand Jury is investigating certain possible violations of federal law, and who has reason to believe that a certain incriminating document is likely to come to the Grand Jury's attention, and who intentionally causes the destruction of that document in order to prevent it from falling into the hands of the Grand Jury, may, in my opinion, properly be convicted of obstruction of justice under 18 U.S.C. § 1503. The statute proscribes conduct which "corruptly . . . endeavors to influence, obstruct, or impede, the due administration of justice . . . ."

■ What must be shown by the Government in the circumstances of the present case is that the Federal Grand Jury was duly empanelled and engaged in the "administration of justice," and that the defendant corruptly sought to impede the Grand Jury's efforts. *U. S. v. Walasek*, 527 F.2d 676 (3d Cir. 1975).

■ The evidence in this case permitted the jury to find that, shortly after a street-corner rendezvous between the defendant and Abrams, in connection with which the defendant concealed his true identity from a third party, and in which the defendant learned that Abrams had been granted immunity, and in which the defendant agreed to pay Abrams' counsel fees, the defendant requested a meeting with Mr. Sweeten, met him on a street corner the very next day, and with "anguish" on his face, requested the destruction of a letter which linked the defendant to one of the transactions in which Abrams collected bribe money. Under these circumstances, the fact that the defendant "reached" the Braunstein letter before the Grand Jury did cannot preclude his conviction for obstructing justice. The Motion in Arrest of Judgment will be denied.

## II. *Motion for Severance*

■ A principal contention of the defense in this case has been that the obstruction counts should have been severed from the remaining counts in the Indictment. Before trial, the defendant filed a Motion under Fed.R.Crim.Proc. 14 for relief from prejudicial joinder, but the Motion was denied. The Motion was renewed in the course of the trial, and was supplemented by the further contention that joinder of Count X was in violation of Fed.R.Crim. Proc. 8(a). I am persuaded that there is no merit in either contention.

The defendant virtually concedes that Count IX was properly joined under Rule 8(a), and could properly be tried at the same time as the preceding eight counts of the Indictment. As I observed in ruling on the pretrial motion, virtually all of the evidence admissible in a joint trial of the first nine counts of the Indictment would be equally admissible if Count IX were tried separately. And, notwithstanding the earnest arguments of the defense to the contrary, I believe the same conclusion is applicable to Count X.

The defendant's argument is a somewhat technical one. The RICO, mail fraud, and conspiracy counts concerned the defendant's alleged activities with Abrams during 1970–73. Count X charges the defendant with urging Mr. Salkind to conceal from the Grand Jury transactions between the defendant and Salkind which occurred in 1967 and 1968, and thus were not alleged to have been part of the conspiracy, racketeering enterprise, or fraudulent scheme referred to in the first eight counts. Thus, it is argued, the Salkind transactions are entirely separate matters, and the jury which tried the Abrams issues should have been entirely insulated from all evidence relating to Salkind.

I do not believe it is possible to compartmentalize the evidence in this case quite so neatly. It must be remembered that both the Salkind incidents and the Abrams incidents related to admissions to the Philadelphia College of Osteopathic Medicine, and that Salkind was involved in transactions with both the defendant and Abrams. More importantly, the Grand Jury was investigating the entire situation. Evidence that the defendant sought to prevent the Grand Jury from learning of his transactions with Salkind involving the Philadelphia College of Osteopathic Medicine would also, necessarily, reflect the defendant's desire to conceal his involvement in the admission practices of that institution. A jury could properly conclude that the defendant's motivation, in urging Salkind to withhold information, was not merely to protect himself from embarrassing disclosures of instances not the subject of any criminal charge but also to conceal his involvement with Abrams in the more recent incidents which were the subject of the charges in other counts of the Indictment. Indeed, the defendant himself testified that it was his conversation with Salkind in March of 1976 which prompted him to seek removal of all of his letters of recommendation from the files of the Philadelphia College of Osteopathic Medicine.

In short, I am satisfied that there was no misjoinder under Federal Rule of Criminal Procedure 8(a), and no prejudicial joinder under Federal Rule of Criminal Procedure 14. The requested severance was therefore properly denied.

### III. *Trial Errors*

Throughout the trial, there were relatively few rulings adverse to the defense, and most of those had to do with the counts as to which the defendant was acquitted. The defendant has, however, pressed a few objections to the Court's charge.

■ First, it is argued that the Court erred in its instructions to the jury concerning the credibility of testimony given under a grant of immunity. Preliminarily, it should be noted that immunized testimony was not involved in Count IX (indeed, in the course of cross-examining Mr. Sweeten, defense counsel used him as a character witness for the defense), and that the testimony of Mr. Salkind in support of Count X was substantially corroborated by other, non-immunized, evidence (including, to some extent, the testimony of the defendant himself). In short, it is clear that the jury refused to convict the defendant of any charge which was based principally upon immunized testimony. It is therefore clear that, even if error had been committed in the immunity instruction, it would not justify a retrial.

■ But I am not persuaded that the charge was erroneous, in the context of this trial. Abrams, the parents who paid the bribes, and Mr. Salkind, all testified under grants of immunity. Of these, only Abrams

and Salkind implicated the defendant in any way.

As noted above, Abrams' credibility was suspect not only because of the grant of immunity, but also because of his conviction for perjury, and his repeated admissions to other instances of lying under oath, and to other crimes as well. A Government witness who was friendly to the defendant characterized Mr. Salkind as a "disreputable man-about-town," a characterization which Salkind's own admissions from the witness stand did much to substantiate.

Needless to say, defendant's capable counsel, in his closing address, very effectively capitalized upon these weaknesses in the Government's case. Counsel for the Government countered with the argument that, after being granted immunity, the witnesses had no motive to lie in order to protect themselves.

In the course of the charge, after giving the usual instructions on credibility (demeanor, interests, motive, seeming probability, corroboration, etc.) I cautioned the jury about the need to scrutinize carefully the testimony of persons previously convicted of perjury. I then pointed out that several witnesses had testified under a grant of immunity, and stated that "that, too, presents special considerations for you to take into account." I thereupon explained the consequences to the witness of a grant of immunity; noted that "it can be argued" that such a witness is free to tell the truth without fear of repercussions, and that this additional freedom might enhance the credibility of such a witness; but also noted that such a witness might have a motive "to ingratiate himself with the authorities or to curry favor with them, and this motivation may cause you to regard his testimony as unreliable;" and also pointed out that a grant of immunity would weigh more heavily against the credibility of a witness "if you should conclude that immunity was granted only in exchange for an agreement in advance to testify against named individuals," and less heavily if there was no such understanding. I concluded by pointing out that "how those

factors should be weighed and what conclusions you reach are entirely up to you."

It should be noted at this point that, except for the reference to the Government's argument in support of credibility of immunized witnesses, the charge did not differ substantially from that requested by the defendant (omitting some of the more extravagant and colorful language):

"I charge you that immunized witnesses are often influenced in their testimony by strong motives of self-interest and self-protection. It is therefore incumbent upon you to look carefully into the secret motive that might actuate an evil mind to draw in and victimize the innocent . . . If you believe from the evidence that any of these people were induced to testify in this case by any promise of immunity or that any hope was entertained by him that he would be benefitted or advantaged by implicating the defendant in the crime charged, you must take that fact into consideration in determining what weight should be given to the testimony, closely scrutinize it, and, unless you can reconcile it with the truth, completely reject it." (Defendant's requested Point No. 1.)

In retrospect, the language employed by the Court in reviewing the various arguments on the immunity question could no doubt be improved upon. Nevertheless, I believe the charge was sufficient to alert the jury to the special considerations applicable in evaluating the credibility of immunized testimony, particularly in view of counsel's extensive arguments on that subject. That the jury properly understood the need to scrutinize the testimony of Abrams and Salkind very carefully before accepting it as credible is borne out by the fact that the jury appears to have rejected all of the testimony of Abrams and Salkind, except when it was corroborated by untainted evidence (including, to a large extent, the testimony of the defendant himself, as mentioned above).

■ A second claim is that, having instructed the jury that, if they believed the defendant's testimony, they must acquit on

all counts with the possible exception of Count IX, I refused to give an unqualified instruction to that effect with respect to Count IX.

As to the first eight counts, the defendant testified unequivocally that he had never received any money from Abrams or anyone else. As to the tenth count, the defendant testified unequivocally that he had never requested or urged Mr. Salkind to withhold any true testimony from the Grand Jury. Therefore, as to those counts, the defendant was entitled to, and received, an unqualified instruction that if the jury believed his testimony they must acquit.

As to Count IX, however, the defendant's testimony was not so clearcut, and an unqualified instruction to acquit if they accepted the defendant's testimony could have been misleading. It is true that, in the course of his testimony, the defendant stated that he did not actually intend to request Mr. Sweeten to destroy the Braunstein letter, although he admitted requesting the destruction of his letters to the Osteopathic College. On the other hand, he also testified that it would have been reasonable for Mr. Sweeten to interpret what he said and did as a request to destroy the letter. He further stated that he did not know what he would have told Mr. Sweeten, had he known for certain that the letter existed. And finally, he sought to explain his conduct as motivated by a desire to shield his family from adverse publicity, and by his panic at being blackmailed by Abrams.

As discussed with counsel in chambers at the time, I was concerned that an overly broad instruction, to acquit if they believed the defendant, might be interpreted by the jury as meaning that they should acquit if they found that the defendant was motivated by a desire to protect his family, or acted in panic. There was also the risk of misleading the jury into believing that only an express verbal communication of the request to Mr. Sweeten would suffice.

Accordingly, with respect to the ninth count, the jury was told that it was a question of how they interpreted the defendant's testimony. The jury was specifically told that they must acquit unless they found beyond a reasonable doubt that the defendant did communicate to Mr. Sweeten a request to remove and destroy the letter, that he acted willfully and intentionally, and that he acted corruptly, for the purpose of preventing the letter from coming to the attention of the Grand Jury. I am persuaded that no error was committed.

The defendant also argues that the Court misconstrued the defendant's testimony with regard to Count IX. I am not aware of any such error, but there would be no grounds for present complaint in any event, since (1) the jury was expressly reminded to accept their own recollection of the testimony, and (2) at the jury's request, all of the testimony of Mr. Sweeten and of the defendant on this subject was reread to the jury in the course of their deliberations.

Additional errors are referred to in the defendant's Motion for a New Trial, but were not pressed at oral argument, and may have been abandoned. In any event, they are clearly without merit. In calling the jury's attention to the two principal factual issues (did the defendant receive bribes, and did the defendant corruptly attempt to obstruct justice?), I expressly reiterated the necessity of proof of each essential element of each crime beyond a reasonable doubt. In summarizing the principal issues upon which the testimony was in conflict, I clearly did not alter the Government's burden of proof. And I believe it was proper to charge the jury that they could properly convict on Counts IX and X if they concluded beyond a reasonable doubt that the defendant acted corruptly in attempting to impede the Grand Jury's investigation; and to refuse to charge that this must have been his "principal" motivation. The case cited by the defendant in support of the latter proposition, *U. S. v. Baker,* 494 F.2d 1262 (6th Cir. 1974), simply does not support the defendant's argument.

In summary, I am satisfied that the defendant received a fair trial, and that there is no valid reason to disturb the jury's verdict.