**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Thomas V. McCOMB,**
**Defendant-Appellant.**

**No. 83–1708.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 23, 1984.

Decided Aug. 31, 1984.

As Amended Sept. 25, 1984.

Rehearing and Rehearing En Banc
Denied Dec. 7, 1984.

Philip R. Melangton, Jr., Melangton, Bradford & Snow, Indianapolis, Ind., for defendant-appellant.

Richard L. Darst, First Asst. U.S. Atty., Sarah Evans Barker, John Daniel Tinder, U.S.Attys., Indianapolis, Ind., for plaintiff-appellee.

* The Honorable Prentice H. Marshall, District Judge for the Northern District of Illinois, sitting by designation.

Before ESCHBACH and POSNER, Circuit Judges, and MARSHALL, District Judge.*

ESCHBACH, Circuit Judge.

The appellant, Thomas V. McComb, was charged in a 12-count indictment with endeavoring to obstruct justice, 18 U.S.C. § 1503 (Counts 1–8), and making false statements under oath before a federal grand jury, 18 U.S.C. § 1623 (Counts 9–12). After a jury trial, he was convicted on two counts of obstruction of justice and two counts of making false statements and acquitted on the rest of the charges.[1] The appellant raises several challenges to his convictions, among them (1) that the conduct alleged in the indictment and proved at trial does not constitute an offense under § 1503, (2) that the government failed to prove the materiality of his false statements before the grand jury, and (3) that the evidence was insufficient to convict on all counts.

We have examined the appellant's contentions and find them to be without merit. Accordingly, we affirm the judgments of conviction.

### I.

Thomas McComb was an Indiana state legislator from 1966 to 1974. He did not seek reelection in 1974, and instead formed McComb and Associates, a firm which handled management and lobbying activities for various trade associations in Indiana. In 1978, the firm was hired by Construction Managers Association of Indiana, Inc. ("CMAI") to render advice on legislation and, later, to provide management services.

In 1979, a bill was introduced in the Indiana General Assembly which would have prohibited an architect or consulting engineer from serving as a construction manager on public projects which he had designed. This bill, denominated S.B. 245,

1. McComb was sentenced to six months imprisonment on Count 3, six months on Count 7, one year on Count 10, and one year on Count 12, all sentences to be served consecutively.

was opposed by CMAI. The bill passed the Senate rapidly, and was sent to the House on February 19, 1979.

In an effort to stop the bill, McComb arranged a meeting at the Indiana Statehouse between Kent Howard, an unpaid aide of House Speaker Kermit Burrous, and members of the CMAI. Michael Carr, CMAI's president, Wendell Ealy, CMAI's treasurer, and McComb were the only CMAI representatives who attended the meeting. The CMAI representatives explained their opposition to the bill, and McComb and Howard then had a brief private conversation. Howard then advised the CMAI members that a $5,000 contribution to Speaker Burrous's campaign committee ("Burrous '80") would be required and that the contributions should be made by checks postdated June 1, after the legislature recessed. The CMAI members understood that the contribution would be required to insure the assignment of the bill to a committee favorable to CMAI's position.[2]

The CMAI members began collecting contributions, and by February 20 they had obtained about $1,300. In order to have at least half of the $5,000 as "good faith" money, Ealy wrote a check to cash for $1,200 on the CMAI account.

In March 1980, a federal grand jury began investigating payoffs in the Indiana legislature, and on May 27, 1980, Ealy received a subpoena commanding him to appear before the grand jury with all personal and CMAI records relating to contributions to the Burrous '80 committee. Ealy signed a waiver of appearance form, turned over the records he had to the FBI, and contacted Carr and McComb. Carr was concerned that the $1,200 check to cash would be discovered in the records and that CMAI would be unable to explain the use of the proceeds. McComb suggested that they could say that the $1,200 had been used by CMAI as a loan to cover start-up expenses for its political action committee ("PAC"). On June 4, McComb received a

subpoena identical to the one that had been served on Ealy and turned over a box of records to the FBI. In the box was the cancelled $1,200 check.

In order to substantiate the story about the loan to the PAC, McComb sometime later in June fabricated minutes detailing a nonexistent meeting of the CMAI board of directors on March 1, 1979. The minutes purported to authorize a $1,200 loan from CMAI to a newly-formed CMAI PAC. It is undisputed that the events memorialized in the minutes never occurred.

The March 1980 Grand Jury was dismissed in November 1980. The grand jury had received the CMAI material, but had returned it to the FBI for analysis. In December 1981, another grand jury was impaneled, and subpoenas were issued to various members of the CMAI. Michael Carr had moved to Texas and, unbeknownst to McComb, had begun cooperating with the investigating authorities. On March 25, 1982, McComb called Carr, who had consented to have his conversations recorded. McComb and Carr had met only three days earlier to discuss the grand jury investigation. During the March 25 conversation, McComb told Carr that he had composed a "sequence of legislation," which apparently was a reconstruction of events surrounding the CMAI's efforts to defeat S.B. 245. He then told Carr that if Carr believed there had been any impropriety, he had "better forget it because there wasn't or [McComb] woulda resigned on the spot." The conversation continued:

> McComb: I just don't, I just don't commit federal or state crimes.
>
> Carr: All right.
>
> McComb: Okay?
>
> Carr: Yeah.
>
> McComb: If, if that in fact you feel happened and you say that, they're gonna indict you.
>
> Carr: I see.
>
> McComb: You.
>
> Carr: Yeah, I don't want that ta happen.

---

2. Burrous subsequently assigned S.B. 245 to the committee chaired by Representative Doris Dor-becker and told her he would "just as soon not see it again." The bill died in committee.

McComb: No. I don't think ya do.

McComb appeared before the December 1981 Grand Jury on March 31, 1982. He testified that the CMAI had made a $1,200 loan to its PAC in February or March, 1979. McComb was asked whether he had ever come into possession of checks. He replied that he had, that the checks were made out to the Burrous '80 campaign, and that he had instructed his staff to forward the checks to the campaign's headquarters. Laura Ullmann, McComb's secretary, later testified at trial that she had received two parcels containing cash and checks written to the Burrous '80 committee. She locked the parcels in McComb's credenza, and asked McComb later what the parcels were. According to Ullmann, McComb told her not to worry about the parcels, and she never saw them again.

## II.

### A. Count 3: Obstruction of Justice

Count 3 charged McComb with endeavoring to obstruct justice by altering the CMAI minutes. McComb alleges several errors in his conviction on this count.

First, he argues that the preparation of false minutes in this instance is not conduct proscribed by § 1503. McComb does not argue that the alteration of records can never amount to an obstruction of justice.[3] See, e.g., United States v. Rasheed, 663 F.2d 843 (9th Cir.1981), cert. denied, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982) (concealing ledgers); United States v. Faudman, 640 F.2d 20 (6th Cir.1981) (altering and destroying corporate records); United States v. Walasek, 527 F.2d 676 (3d Cir.1975) (destroying corporate records). Rather, he argues that his conduct is not reached by the statute because no subpoena had yet issued for CMAI's minutes.

The government disputes McComb's reading of the subpoenas issued for CMAI's records. It notes that the Ealy subpoena on May 27 and the McComb subpoena on June 4 asked for "all personal records and all records of [CMAI] regarding any and all contributions and funds contributed to the Burrous for '80 committee or campaign." The government contends that the $1,200 check was written to enable CMAI to collect at least half of the promised $5,000 contribution requested by Howard. The minutes, then, were written to provide an innocent explanation for the check's existence. Therefore, the government reasons, the minutes would fall within the subpoenas' request for records regarding contributions to the Burrous campaign.

While the government's reading of the subpoenas is plausible, we need not decide whether the minutes fell within the literal reach of the subpoenas. We are convinced that it is an endeavor to obstruct justice for one who has received a grand jury subpoena, and turned over documents pursuant to that subpoena, to fabricate records to provide an innocent gloss to the records already before the grand jury. Cf. United States v. Turcotte, 515 F.2d 145 (2d Cir.), cert. denied, 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975) (§ 1503 violated when defendants fabricated story for potential witness to tell grand jury even though witness had not been subpoenaed); United States v. Fineman, 434 F.Supp. 197 (E.D.Pa.1977), aff'd, 571 F.2d 572 (3d Cir.), cert. denied, 436 U.S. 945, 98 S.Ct. 2847, 56 L.Ed.2d 786 (1978) (obstruction of justice for defendant to cause destruction of incriminating letter when he knew grand jury was investigating him and had reason to believe letter would come to light). McComb's claim that he created the records to cover up a possible state felony, rather than to mislead the grand jury, must also be rejected. The evidence shows that CMAI president Carr discussed the check

---

3. McComb appears to argue that the alteration of records is not a cognizable offense under the so-called "omnibus" clause of § 1503. This argument has been repeatedly rejected, see e.g., United States v. Faudman, 640 F.2d 20 (6th Cir.1981). The one circuit which had previously limited the application of the omnibus clause of § 1503 to actual acts of intimidation has recently rejected that view. See United States v. Rasheed, 663 F.2d 843 (9th Cir.1981), cert. denied, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982).

with McComb after the 1980 subpoenas had been served, and McComb suggested the story about a loan to the PAC. Knowing that the grand jury was in possession of the check and aware of the subject matter of the investigation from the subpoenas, McComb fabricated the minutes, which he later turned over to a different grand jury.

■ McComb's other claims under Count 3 go to the sufficiency of the evidence. The parties agree that a prerequisite for a conviction for obstruction of justice is the pendency of a judicial proceeding which equates to an "administration of justice." *See United States v. Walasek*, 527 F.2d 676 (3d Cir.1975). A grand jury investigation is such a proceeding. *See, e.g., United States v. Gates*, 616 F.2d 1103 (9th Cir. 1980); *United States v. Shoup*, 608 F.2d 950 (3d Cir.1979); *United States v. Griffin*, 589 F.2d 200 (5th Cir.), *cert. denied*, 444 U.S. 825, 100 S.Ct. 48, 62 L.Ed.2d 32 (1979). The appellant argues, however, that there was insufficient evidence of a grand jury proceeding at the time he concocted the minutes. According to McComb, the 1980 subpoenas were issued to gather evidence in an ongoing FBI investigation, rather than in aid of a grand jury investigation. Interference with an agency investigation is not a crime under § 1503, although such interference violates 18 U.S.C. § 1505. In support of his claim that the investigation was in reality being conducted solely by the FBI, appellant points to the testimony of FBI Agent Eisgruber at a preliminary hearing. Eisgruber testified that the FBI political corruption task force, to which he was assigned, had on hand a supply of blank subpoenas, signed by the Clerk of the District Court. Eisgruber explained that the subpoenas Ealy and McComb received were filled in by the FBI with the approval of the United States Attorney's office, and he believed that approximately two-thirds of the people subpoenaed chose to sign a "Waiver of Appearance" form and to comply with the subpoena by merely turning over the requested documents to the FBI. The remaining one-third appeared before the grand jury to deliver the requested documents in person. The fore-man of the 1980 Grand Jury testified at trial that he did not issue any subpoenas and assumed that they were issued by the attorneys presenting the cases to the grand jury. The box of documents which McComb turned over to the FBI was presented to the 1980 Grand Jury, which returned it to the FBI for analysis.

■ The appellant argues that because the grand jury did not itself direct the subpoenas to be issued, and because the decision to issue the subpoenas was made jointly by the FBI and the United States Attorney's office, the investigation had not yet become a grand jury investigation for purposes of the statute.

Several courts have considered the question of when an investigation by law enforcement officials crosses the threshold to become a pending grand jury investigation for purposes of § 1503. *See United States v. Vesich*, 724 F.2d 451 (5th Cir.1984); *United States v. Simmons*, 591 F.2d 206 (3d Cir.1979); *United States v. Walasek*, 527 F.2d 676 (3d Cir.1975). These courts have uniformly rejected the proposition, advanced by appellant, that some actual act of the grand jury is required before a grand jury investigation can be held to be "pending" within the meaning of the statute. Thus, the court in *Simmons* refused to hold that the grand jury must be aware of the subpoena or involved in the investigation in some other way before a particular act could be held an obstruction under § 1503. *Simmons*, 591 F.2d at 209. The court noted that such a requirement would ignore the realities of the manner in which a grand jury operates and the mechanism by which subpoenas are issued, observing that

"although grand jury subpoenas are occasionally discussed as if they were instrumentalities of the grand jury, they are in fact almost universally instrumentalities of the United States Attorney's office or of some other investigative or prosecutorial department of the executive branch."

*Id.* at 210 (quoting *In re Grand Jury Proceedings*, 486 F.2d 85, 90 (3d Cir.1973)). *Accord United States v. Vesich*, 724 F.2d 451 (5th Cir.1984). Rather than establish a rigid rule denominating some act of the grand jury that would be required to establish pendency, courts have asked "whether the subpoena is issued in furtherance of an actual grand jury investigation, i.e., to secure a presently contemplated presentation of evidence before the grand jury." *Walasek*, 527 F.2d at 678. Such an inquiry allows courts to supervise the use of grand jury subpoenas while recognizing that it is usually the task of the United States Attorney's office, with the help of such agencies as the FBI, to amass and coordinate the evidence to be presented to a grand jury. *Cf. United States v. Ryan*, 455 F.2d 728 (9th Cir.1972) (conviction under § 1503 reversed; transparent use of grand jury subpoenas to gain access to material for IRS investigation).

Turning to the facts of this case, we have no difficulty in determining that the subpoenas issued for the CMAI records were in furtherance of an actual grand jury investigation. First, recipients of the subpoenas could choose to exercise their right to appear before the grand jury themselves, rather than decide merely to relinquish their records to the FBI. The use of appearance waivers such as the ones here have been held not to usurp the function of the grand jury. *United States v. Duncan*, 598 F.2d 839 (4th Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979); *United States v. Phelps*, 526 F.Supp. 686 (W.D.Okla.1981). Nor do we find anything sinister in the grand jury's request that the records be analyzed by the FBI. The CMAI subpoenas asked for all records relating to campaign contributions to the Burrous '80 campaign. This request was apparently met by the delivery of all

the CMAI's financial records. As another court has noted,

> we think it would have been completely unrealistic to have required the grand jury to consider this volume of evidence in its raw state without the benefit of prior analysis and summary, and we also think it would have been unrealistic to require the staff of the United States Attorney to work with this evidence without the assistance of the investigative agency concerned.

*United States v. Universal Manufacturing Co.*, 525 F.2d 808, 812 (8th Cir.1975); *United States v. Phelps*, 526 F.Supp. 686, 689 (W.D.Okla.1981). This is not a case, such as *United States v. Ryan*, 455 F.2d 728 (9th Cir.1972), where there was no grand jury investigation in progress to which the subpoenaed documents could have been relevant. The March 1980 Grand Jury was investigating whether payments had been made to Indiana legislators in return for legislation.[4] We hold therefore that the government established that a grand jury investigation was pending for purposes of the statute.[5]

 McComb also contests the sufficiency of the evidence showing his intent to obstruct justice. Specific intent to impede a grand jury investigation is an essential element of a § 1503 violation. *United States v. Ryan*, 455 F.2d 728, 734 (9th Cir.1972). Intent to obstruct justice is something that a jury may infer from all the surrounding facts and circumstances. *United States v. Haldeman*, 559 F.2d 31, 115–16 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). It is undisputed that the events memorialized in the minutes never occurred, and that McComb composed the minutes. He contends that he was directed to write the minutes by the CMAI board, and that he never knew that the events in the minutes had not occurred. This conten-

---

**4.** The March 1980 Grand Jury returned an indictment against an Indiana state senator.

**5.** Nor do we consider it relevant to a charge of endeavoring to obstruct justice that the grand jury adjourned without considering the subpoe-

naed records, for there is no requirement that the endeavor be successful. The practice of transferring records and cases to subsequent grand juries is common. *See In re Grand Jury Proceedings*, 658 F.2d 782 (10th Cir.1981).

tion cannot withstand scrutiny. The evidence shows that McComb himself suggested the cover story of a loan to the PAC after the grand jury subpoenaed the records containing the $1,200 check. McComb's claim that he lacked intent to impede the investigation has no merit.[6]

### B. Count 7: Obstruction of Justice

Count 7 charged that McComb endeavored to influence the testimony of Michael Carr before the grand jury during a conversation occurring March 25, 1982. McComb challenges both the sufficiency of the indictment and the sufficiency of the evidence to convict him of the offense.

The appellant's complaint about the indictment is difficult to follow; the indictment tracks the language of the statute and states that McComb "corruptly endeavor[ed] to influence the testimony of Michael M. Carr, prospective witness in that investigation ..." on March 25, 1979. The indictment then quotes a portion of the March 25 conversation, in which McComb tells Carr that he had "better forget it" if Carr believed there had been any impropriety. The possible improprieties to which McComb was referring are made clear by the immediately preceding sentences, in which McComb and Carr discussed the "sequence of the legislation and ... the sequence of our contributions." McComb continues by telling Carr that he does not "commit federal or state crimes" and that if, indeed, Carr believed that "that ... happened" and testified to that belief, Carr would be indicted.

■ An indictment is sufficient if it (1) contains the elements of the offense charged, (2) sufficiently apprises the accused of what he must be prepared to meet, and (3) enables the accused to plead a judgment under the indictment as a bar to any subsequent prosecution for the same offense. *Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962); *United States ex rel. Ballard v. Bengston,* 702 F.2d 656 (7th Cir.1983). McComb's complaint about the indictment appears to go to the second of these criteria: he claims that the charge gives no indication of which portion of the quoted conversation represents McComb's attempt to influence Carr's testimony.

■ We do not agree that the indictment is vague. The quoted conversation is not lengthy, and the date of its occurrence is given. Moreover, appellant does not inform us of how he was misled, or his defense in any way hampered, by the supposed vagueness of the charge. *See United States ex rel. Ballard v. Bengston, supra,* 702 F.2d at 661.

■ McComb again disputes the evidence of a pending grand jury proceeding. The evidence shows that a grand jury was impaneled in December 1981 and extended through July 1982. In February 1982, McComb told Carr that subpoenas had been served on several members of CMAI. On March 22, 1982, McComb and Carr discussed the grand jury proceedings with another CMAI member and spoke about how it was necessary not to deviate from their stories or to offer information. It was after these conversations that McComb had the conversation with Carr. Not only is it apparent that McComb knew of the grand jury investigation, it is clear that he expected Carr to testify, as McComb himself testified on March 31. This evidence establishes that there was a grand jury investigation pending on March 25, 1982, and that McComb knew of it.

■ McComb then argues that the March 25 conversation is susceptible of an

---

**6.** McComb argues that the decision in *United States v. Moon,* 718 F.2d 1210 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984) mandates reversal in this case. In *Moon,* the documents had been altered long before they were subpoenaed, and there was no evidence that the defendant knew that he could have resisted production of those documents on Fifth Amendment grounds. The court found no evidence that the defendant intended to impede the investigation. That case is clearly distinguishable, for here the jury could have found that the defendant's falsification of records was done for the express purpose of impeding the investigation.

innocent explanation, and that the government has not proven that the conversation was an attempt to obstruct justice. According to McComb, he was merely telling Carr what he believed to be the truth—that he (McComb) had committed no crimes—and that if Carr testified otherwise, Carr might be indicted. McComb cites *Cole v. United States*, 329 F.2d 437 (9th Cir.), *cert. denied*, 377 U.S. 954, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964):

> "It is not an unlawful attempt to influence or impede a witness, or the due administration of justice, for one to seek to obtain from a witness a statement of the facts as he believes them to be, without the exercise of undue influence .... Such an effort is not regarded with favor, because of the temptation to influence the witness unduly; but the mere request for a statement believed to be true does not offend the statute ... because it is not corrupt conduct."

*Id.* at 441 (quoting *Harrington v. United States*, 267 F. 97, 101 (8th Cir.1920)); *accord United States v. Cioffi*, 493 F.2d 1111 (2d Cir.), *cert. denied*, 419 U.S. 917, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974).

The cases just cited hold, however, that it is a violation of the statute to endeavor to influence a witness not to recall something, or even to invoke the Fifth Amendment, if the motive of the inducer is to shield his own criminal behavior, *Cioffi*, 493 F.2d at 1119; *Cole*, 329 F.2d at 441–42, for the statute prohibits "corrupt" attempts to influence testimony. Thus, if McComb were attempting to get Carr to "forget" events in order to protect McComb from incrimination, he could properly be found guilty of endeavoring to obstruct justice.

Viewing the evidence in the light most favorable to the government, as we are required to do, we hold that a jury could rationally have found that the appellant's conversation was an endeavor to obstruct justice. The evidence shows that McComb arranged the statehouse meeting with Howard, and there was evidence from which the jury could infer that McComb later delivered the contributions to Howard. The jury could also have found that McComb concocted the cover-up story about a loan to the PAC. In fact, McComb admitted stating to some CMAI members, in relation to the $1,200, that "what we have done is to commit a felony." Thus, McComb's statement to Carr that Carr had better "forget it" if he believed improprieties occurred could rationally have been viewed as a request that Carr suppress any testimony about events which might have incriminated McComb. *See United States v. Nicosia*, 638 F.2d 970 (7th Cir.1980), *cert. denied*, 452 U.S. 961, 69 L.Ed.2d 972 (1981).

### C. Counts 10 and 12

Both of the remaining counts on which McComb was convicted charged that he had made material false statements to the December 1981 Grand Jury during his testimony on March 31, 1982, in violation of 18 U.S.C. § 1623. McComb argues that neither of these convictions can stand, because he claims there was no showing that the testimony was material to the grand jury's investigation.

 An essential element of the crime of making false declarations to a grand jury is that the statements be material to the grand jury's investigation. *United States v. Ostertag*, 671 F.2d 262, 264 (8th Cir.1982); *United States v. Picketts*, 655 F.2d 837, 840 (7th Cir.), *cert. denied*, 454 U.S. 1056, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981); *United States v. Thompson*, 637 F.2d 267, 268 (5th Cir. 1981); *United States v. Berardi*, 629 F.2d 723, 727 (2d Cir.), *cert. denied*, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980). Materiality for purposes of § 1623 is broadly defined as a statement's "effect or tendency to impede, influence, or dissuade the grand jury from pursuing its investigation." *United States v. Picketts*, 655 F.2d at 839 (quoting *United States v. Devitt*, 499 F.2d 135, 139 (7th Cir.1974)). Mere potential interference with a line of inquiry is sufficient to establish materiality. *United States v. Howard*, 560 F.2d 281 (7th Cir.1977).

■ However, it is the government's burden to establish a nexus between the grand jury's investigation and the defendant's false statements by presenting some evidence about the scope of the investigation. This can be done by any of a variety of means. The foreperson or some other member of the grand jury may be called to establish the investigation's scope, *United States v. Byrnes*, 644 F.2d 107 (2d Cir. 1981); *United States v. Saenz*, 511 F.2d 766 (5th Cir.1975), *cert. denied*, 423 U.S. 946, 96 S.Ct. 356, 46 L.Ed.2d 277 (1976). The attorney who presented the government's case to the grand jury might be called to testify, *United States v. Berardi*, 629 F.2d 723 (2d Cir.), *cert. denied*, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980); *United States v. Cuesta*, 597 F.2d 903 (5th Cir.), *cert. denied*, 444 U.S. 964, 100 S.Ct. 451, 62 L.Ed.2d 377 (1979). The transcript of the grand jury proceedings might be introduced into evidence, *United States v. Picketts*, 655 F.2d 837 (7th Cir.), *cert. denied*, 454 U.S. 1056, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981), or the indictments returned by the grand jury might be examined, *United States v. Bell*, 623 F.2d 1132 (5th Cir.1980).

■ The events at issue in this case occurred before two separate grand juries. The government called Charlene Heffner from the district court clerk's office, who testified that a grand jury was impaneled in March 1980, and that its service was extended until December 31, 1980. She further testified that another grand jury had been impaneled in December 1981, and its service extended until July 31, 1982. The foreman of the March 1980 Grand Jury, Harold Brockley, testified that the grand jury was investigating the possibility that payoffs had been made in exchange for legislation and that the grand jury had returned an indictment against an Indiana senator.[7] No member of the 1981 Grand Jury was called to testify, nor was the Assistant United States Attorney who worked with that body. There is no evidence that the 1981 Grand Jury indicted anyone other than McComb.[8] The only evidence introduced at trial concerning the scope of the 1981 investigation was the transcript of McComb's testimony and the taped conversations between members of the CMAI.

■ The Fifth Circuit has disapproved the use of introducing only a partial transcript of the grand jury proceedings to establish the scope of the investigation, *United States v. Bell*, 623 F.2d 1132 (5th Cir.1980), and we agree that it is generally not good procedure to rely on only the defendant's grand jury testimony. However, we are satisfied that in this case there was sufficient evidence from which the district court could have found that the grand jury was investigating the possibility of political payoffs.[9] McComb's testimony was lengthy: the transcript of the testimony is 97 pages long. The grand jury's questions were exclusively about McComb's lobbying efforts on behalf of CMAI, his connection with Howard and Burrous, and the course of S.B. 245. Moreover, the recorded conversations between McComb and various CMAI members make it clear that the focus of the inquiry was the CMAI's relationship with Burrous.[10]

---

7. Counsel for the government informed us at oral argument that during the year that elapsed between the service of the grand juries with which we are concerned in this case, two convictions were obtained against elected Indiana officials.

8. The perjury indictment itself cannot be used to establish materiality, since the materiality allegations in the charge cannot serve as proof of that fact. *See United States v. Cosby*, 601 F.2d 754 (5th Cir.1979).

9. The materiality of a false statement for purposes of § 1623 is a question of law for the court to decide. *United States v. Raineri*, 670 F.2d 702, 718 (7th Cir.), *cert. denied*, 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982).

10. Government Exhibit 39 is a transcript of a conversation between McComb and Carr, recorded March 9, 1982. During the conversation, McComb states that "what they're lookin' for is extortion or deals . . . ." Harry Cooler, a CMAI member who had already appeared before the grand jury, states during a recorded conversation with McComb and Carr on March 22 that he was repeatedly asked about contributions to the Burrous campaign: "[T]hey'd get

*See United States v. Carter,* 721 F.2d 1514 (11th Cir.1984) (taped conversations of defendants, who were involved in drug conspiracy, about their testimony before grand jury evidence of scope of investigation).

■ Having determined the scope of the investigation, we must now decide whether the appellant is correct in his assertion that the government failed to establish a sufficient nexus between the investigation and his statements. Count 10 charged McComb with falsely testifying that the CMAI made a $1,200 loan to its PAC in February or March, 1979. The government has clearly established that this loan never occurred, and that the $1,200 was, in fact, intended as "up front" money for Speaker Burrous. It is clear that a truthful statement would have aided the grand jury's inquiry, and conversely, that McComb's false statement had the potential to interfere with the investigation. *See United States v. Raineri,* 670 F.2d 702, 718 (7th Cir.), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982) (material if tends to mislead or hamper inquiry regardless of whether testimony actually impeded inquiry); *United States v. Berardi,* 629 F.2d 723, 728 (2d Cir.), *cert. denied,* 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980) (materiality assessed by inquiring what effect truthful answer would have had). A truthful answer could have led the grand jury to the request by Howard for a contribution in exchange for a favorable committee assignment.[11]

Count 12 alleged in part:

It was a matter material to [the grand jury] proceeding that the Grand Jury determine what was done with checks written to the Burrous '80 campaign received by the CMAI from CMAI members during February and March of 1979.

around it, then they'd come back to it. Then they'd go away from it and then come back to it." Government Ex. 61.

**11.** McComb argues that the false statement for which he was convicted was not responsive to the question asked, and thus cannot be the basis of a conviction for perjury under *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34

The indictment then quoted McComb's testimony that he had instructed his staff to forward campaign contributions for Burrous to the Burrous campaign headquarters. It is this testimony which allegedly was false.

■ The government proved that checks from CMAI members were delivered to McComb's office by Wendell Ealy in late February 1979 and that at least some of these checks next appeared in the possession of Kent Howard in October 1979. McComb's secretary testified that she did not remember having been asked to forward the checks, and that she would have remembered because she was surprised when Ealy delivered the cash and checks to the McComb office. Had McComb truthfully related what became of the checks after they arrived in his office— checks which had been postdated by several months so as to appear to have been written after the legislature recessed and which had been solicited in response to Howard's request for a contribution—it might have led the investigation back to Howard. While we cannot be certain what McComb's response would have been, his untruthful response was misleading, and could potentially have impeded the investigation. Potential interference is all that is required.

■ McComb raises two final objections to his convictions on Counts 10 and 12. First, he argues that he cannot be convicted twice for the "same testimony." It is well established that separate lies before the grand jury are separately punishable, *see United States v. Doulin,* 538 F.2d 466 (2d Cir.), *cert. denied,* 429 U.S. 895, 97 S.Ct. 256, 50 L.Ed.2d 178 (1976); *United States v. Tyrone,* 451 F.2d 16 (9th Cir. 1971), *cert. denied,* 405 U.S. 1075, 92 S.Ct.

L.Ed.2d 568 (1972). In *Bronston,* however, the defendant's answers were not only nonresponsive but literally true. We agree that McComb volunteered the statement about the $1,200 loan which led to the questioning about the loan's date. We know of no reason, however, to shield one who volunteers false information from liability for perjury.

1494, 31 L.Ed.2d 808 (1972), so long as different facts are needed to prove the falsity of each statement, as was the case here. McComb also claims that the guilty verdicts on Counts 10 and 12 are inconsistent both with each other and with his acquittals on Counts 9 and 11. We have noted before that "as long as the evidence is sufficient to support the counts on which the defendant was actually convicted, a jury verdict reflecting compromise or even inconsistency is permissible and legitimate." *United States v. Fields*, 689 F.2d 122, 126 (7th Cir.), *cert. denied*, 459 U.S. 1089, 103 S.Ct. 573, 74 L.Ed.2d 935 (1982). Moreover, the only inconsistency between these verdicts to which McComb points is that the jury must have credited some parts of Carr's testimony and discredited other parts. It is not our function to reassess a jury's credibility determinations, especially where, as here, there was simply more support for some parts of Carr's testimony than others. We have reviewed the evidence in support of these convictions and find it sufficient.

### III.

For the reasons expressed above, we affirm the judgment of the district court.