**UNITED STATES of America, Appellee,**

v.

**Norma JESPERSEN, Defendant,**

**Edward H. Jespersen, Defendant–
Appellant.**

**No. 1271, Docket 94–1425.**

United States Court of Appeals,
Second Circuit.

Argued April 7, 1995.

Decided Sept. 7, 1995.

Randall W. Richards, Ogden, UT (Richards, Caine & Allen, Ogden, UT, of counsel), for defendant-appellant.

Michael T. Cornacchia, Assistant United States Attorney for the Eastern District of New York, Brooklyn, NY (Zachary W. Carter, United States Attorney, Susan Corkery, Assistant United States Attorney, Brooklyn, New York, of counsel), for appellee.

Before: WINTER, MAHONEY, and CALABRESI, Circuit Judges.

MAHONEY, Circuit Judge:

Defendant-appellant Edward H. Jespersen appeals from a judgment entered July 29, 1994 in the United States District Court for the Eastern District of New York, Arthur D. Spatt, *Judge,* that convicted Jespersen, after a jury trial, of obstructing justice by impeding a grand jury investigation in violation of 18 U.S.C. § 1503 (1988).[1] Jespersen was sentenced to fifteen months imprisonment, to be followed by two years supervised release. He is currently free on bond.

On appeal, Jespersen argues that the government failed to prove that he intended to impede the grand jury investigation, or that a backdated contract which he submitted to the grand jury actually obstructed the grand jury. Jespersen also contends that the trial court's instructions on the obstruction count resulted in a constructive amendment that improperly broadened the indictment.

We affirm the judgment of the district court.

## Background

As the chief of the Engineering and Operations Section ("EOS") at the Brookhaven Service Center of the Internal Revenue Service (the "IRS") located in Holtsville, Long Island, New York (the "IRS Center") from 1986 through 1991, Jespersen was responsible for the maintenance of all physical structures and systems at the IRS Center. During this time, contracts for work to be performed at the IRS Center were awarded through an independent EOS bidding system in which Jespersen's employees would solicit bids and submit them to Jespersen, who also served as the Contracting Officer Technical Representative, to decide who would receive the contracts. Alternatively, contracts were let via a contractor whose performance Jespersen supervised and evaluated, and to whom Jespersen regularly specified the vendors to be used for work at the IRS Center.

---

1. As applicable to Jespersen's conduct in this case, § 1503 provided:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

This purchasing responsibility was turned over to a procurement and supply unit in May 1991 after an internal review of procurement practices at the IRS Center.

Philip Temerario, the owner and president of Vinton Construction Inc. ("Vinton"), testified that he had known Jespersen both socially and professionally for at least fifteen years prior to 1986. Temerario had done subcontracting work for Jespersen when Jespersen was the maintenance supervisor at Cerro Wire and Cable Company prior to Jespersen's employment at the IRS Center. Temerario testified that he and his wife socialized with Jespersen and his wife several times a year. In 1986, Temerario was awarded his first contract at the IRS Center; by 1988, Temerario had received roughly $100,000 worth of IRS Center contracts.

Patricia Forsythe, Jespersen's secretary between 1986 and 1988, testified that Jespersen had what "was almost like an open-door policy" for Temerario, whom she repeatedly saw meet with Jespersen at Jespersen's office or elsewhere at the IRS Center. She stated that Jespersen and Temerario had a "friendly" relationship, as a result of which Temerario was often invited "to come in, look over a job, give a price on it, and eventually be given the awards." Jespersen requested that Forsythe type and "clean ... up" invoices for Temerario "lots of times." Forsythe testified that during this period, Temerario inspected a home for her daughter at Forsythe's request without receiving payment.

Temerario testified that sometime in August or September 1988, Jespersen approached Temerario at the IRS Center about doing window and siding work on Jespersen's house. Temerario had installed a kitchen counter top and storm windows on a porch at Jespersen's house in the early 1980s. At Jespersen's suggestion, Temerario discussed the proposed 1988 project with Jespersen's wife, Norma Jespersen, at the Jespersens' home. Approximately one week later, at the IRS Center, Temerario quoted Jespersen a price of approximately $9,500 for the job. After a few days, Jespersen told Temerario to start the project, although no contract was signed. Temerario's subcontractor, Richard Busch, performed the labor and completed the project in December 1988. Evidence at trial included Temerario's cancelled checks for purchasing materials and paying Busch for his labor.

Temerario testified that he approached Jespersen in the cafeteria of the IRS Center in "the beginning of '89" and told him that the cost of the improvements to Jespersen's home was approximately $9,600. Jespersen responded "okay," but never said that he would pay Temerario. Temerario further testified that he was never paid, and that he never submitted a bill or discussed the matter with Jespersen again, because: "As time went on and I was getting work and I was getting the opportunity. So I just, I don't know, sort of didn't want to rock the boat." When asked what he meant by that expression, Temerario responded that "I figured maybe I wouldn't get any more work." Temerario testified that his company received IRS contracts worth "well over $230,000" in 1989, "under $200,000" in 1990, $75,000 to $100,000 in 1991, the year control of procurement was turned over to the procurement and supply unit, and in 1992, after Jespersen's departure from the IRS Center, "less" work.

A federal grand jury investigation of procurement practices at the IRS Center was initiated in late 1991 in response to the findings of the internal inspection that had been commenced by the IRS in May 1991. An inspector for the Internal Security Division of the IRS, William A. Zybul, interviewed Jespersen on February 21, 1992 in connection with this investigation. Zybul testified that when he asked Jespersen about his relationship to Temerario, Jespersen responded that he had a "strictly business" relationship with Temerario, that he was "not a friend," and that he had "no social relationship at all" with him. Jespersen also denied that Temerario or Vinton had done any work on his house, and that Temerario had ever given him a gratuity. When Zybul asked Jespersen who had done the extension on his house and the siding and windows, Jespersen responded that "he would have to consult with his attorney prior to answering the question."

Zybul interviewed Jespersen again on February 26, 1992, at which time, according to Zybul, Jespersen reasserted "that there was no relationship between himself and Mr. Temerario, social or otherwise." Jespersen recalled, however, that he had once encountered a minor electrical problem with which Mr. Temerario had helped him on a Sunday without reimbursement, but "that was the only time that Mr. Temerario ever did any work for him at his residence."

Temerario testified that Jespersen spoke to him in the period between February and April 1992 concerning a federal investigation, telling him "[t]hat he is under investigation, and we have a problem. He doesn't have a receipt for the work I did on his house. And could I give him a receipt? I replied I really couldn't do that because he didn't pay me, and I didn't have no dates." Temerario further testified that Jespersen "said he had dates he could put down" and gave him "paperwork with the dates on it."

Temerario stated that using this paperwork, he created and signed a contract between Vinton and Norma Jespersen for the work that was performed on Jespersen's house in 1988 (the "Contract"). The Contract indicated that Jespersen had paid $3,000 as an initial deposit, and had made additional payments of $3,000 and $3,600 on November 28, 1988 and December 16, 1988, respectively. Temerario typed the date August 10, 1988 on the top of the Contract, and dated his signature August 11, 1988. He testified that he gave the Contract to Jespersen at the IRS Center a few days after creating it, and did not retain and was never given a copy.

The grand jury issued a subpoena on June 30, 1992 (the "Subpoena") that was served on Jespersen on July 8, 1992. The Subpoena directed Jespersen to produce, by July 23, 1992, "[i]nvoices, bills, estimates, cancelled checks, cash receipts relating to and/or reflecting improvements, repairs, alterations or additions to [his house] for the period January 1988 to the date of compliance with this subpoena." On July 23, 1992, Jespersen delivered the Contract, which by this time was signed by both Norma Jespersen and Temerario, to Zybul. Zybul testified that Jesper-

sen then told him that he "wasn't going to make any statements" and that "it could be a problem regarding the services he received."

Temerario testified that later that same day, Jespersen, without a prior appointment, arrived at Temerario's office. Temerario got into Jespersen's car and Jespersen drove to a nearby parking lot, where Jespersen told Temerario that his records had been subpoenaed and that he had turned in the Contract. Temerario testified that he then "told [Jespersen] it was a very bad thing we did, and I was hoping he didn't turn that paper in.... That they already started an investigation on me prior to this meeting, and that, you know, the lawyer informed me I am in very serious trouble here." Temerario asserted that in response, Jespersen said: "I paid you, and you say I paid you. And we should have no problems," and further stated that "the only problem would be if [I] didn't claim it ... you know, if I didn't pay taxes on it, and he would help me." Finally, Jespersen allegedly handed Temerario a card from Jespersen's attorney and stated that if Temerario had a lawyer, "maybe they wanted to talk."

Zybul testified that he spoke to Norma Jespersen at her home on August 28, 1992, at which time she stated that the Contract had been "signed four years ago, and that she did sign it." Philip Peyser, an internal auditor for the IRS Center employed by the Inspection Division, testified that he had interviewed Norma Jespersen on April 15, 1993, and that she then told him that siding and window work on her home, as well as previous work on her back porch, had been done by Temerario, whom she had known for approximately thirty years. Peyser testified that she further asserted, contrary to her 1992 statements to Zybul, that "as a result of the [S]ubpoena she [had gone] back to Vinton Construction, to Phil Temerario, in 1992, and requested that he provide her with a receipt for the siding and window job that had been done in 1988," and that "she [had] asked for the [C]ontract from Vinton Construction, in 1992, after the [S]ubpoena had been issued." The defense did not cross-examine Peyser. Zybul also participated in this interview, and

his testimony generally confirmed Peyser's account.[2]

On November 8, 1993, Jespersen was charged in a three-count indictment with: (1) receiving a gratuity from Vinton for and because of official acts performed and to be performed by Jespersen as a public official in violation of 18 U.S.C. § 201(c)(1)(B); (2) knowingly and willfully obstructing and impeding and endeavoring to obstruct and impede the due administration of justice by creating and producing and causing to be created and produced a false document in response to a subpoena issued by a duly empaneled grand jury in violation of 18 U.S.C. § 1503; and (3) knowingly and willfully making a false statement to members of the IRS Internal Security Division, by asserting that the Jespersens had paid Vinton approximately $10,000 for siding and windows for their home, in violation of 18 U.S.C. § 1001.

After, the evidence that we have summarized was presented at trial, a charging conference was held at which, after considerable discussion, the district court concluded that it would instruct the jury to determine whether there had occurred the "submission of a false contract as to the monies paid or the date of execution." Jespersen's counsel objected to this formulation.

The issue arose again during the jury's deliberations, when the jury sent to the court a note requesting "instruction on [the] law pertaining to what constitutes a 'false document' (i.e., for example, backdating, nondisclosure of backdating, creation of document after subpoena)." The district court treated this inquiry as relating to its prior instruction, as to count two of the indictment, that the jury must find that Jespersen "did corruptly obstruct or impede or endeavor to obstruct or impede the grand jury proceeding in the discharge of their duty by the submission of a false document, namely, [the Contract]".

The district court rejected Jespersen's request that, in partial response to this jury note, the jury be charged that "the only

evidence that has been submitted to the Court is that the [Contract] was made before the subpoena was issued." Jespersen also argued that the jury should be instructed that backdating is not "on its face ... illegal, unless it is done to deceive the grand jury." The district court initially not only agreed, but went further, stating that "if the facts were true in that document, and he merely backdated it, that would not be in my view obstruction as a matter of law."

However, after further reflection and research overnight, the district court reversed its position the following morning, and instructed the jury:

> Now, in response to your particular question, ... you will have to determine whether the government proved beyond a reasonable doubt that all or a portion of the [Contract] was false, was known to be false to the defendant, and that the false portion of the [Contract], whether it be relating to backdating or non-disclosing of the backdating, or the time of the creation of the [Contract], or ... a false statement that monies were paid, was done knowingly and willfully with the intent to obstruct and impede the grand jury.

> In this regard I further instruct you that the government must prove beyond a reasonable doubt that by submitting this [Contract] the defendant made an effort to accomplish an evil purpose, namely, to impede or obstruct the operation of the grand jury investigating procurement in the Internal Revenue Service.

The jury returned a verdict of guilty only on count two. This appeal followed.

## Discussion

Jespersen argues on appeal that the government did not sufficiently establish either (1) his intent to impede the grand jury investigation, or (2) a nexus between the backdating of the Contract and any endeavor to impede the investigation. He assumes as a factual predicate for both of these arguments that because he was acquitted on count one

---

**2.** Zybul testified that on April 15, 1993, Norma Jespersen, by stating that she made up the Contract and signed it in 1992 rather than in 1988, contradicted the version of the events that she had provided on August 28, 1992.

of accepting the construction work on his home from Temerario, the recital in the Contract of payment for that work must be taken as true, and only the backdating of the Contract is at issue.

Jespersen also argues that because the indictment charged in count two that he had "creat[ed] and produc[ed] [the Contract] and caus[ed] [it] to be created and produced," the district court "effectively broadened the indictment" and effected an impermissible constructive amendment of the indictment "by only requiring a finding that the [Contract] was produced to the Grand Jury in response to a subpoena." In this connection, in charging the elements required to be established for a conviction under count two, the district court first read the language of the indictment as quoted above, but then stated (without exception by Jespersen) that the government need establish only "the *submission* of a false document, namely [the Contract] [emphasis added]." Jespersen moved posttrial for acquittal on the same ground raised on this appeal with respect to the asserted constructive amendment of the indictment.

We shall address first Jespersen's claim that the evidence was insufficient to support his conviction under § 1503, and then his argument that the indictment count charging a violation of that statute was constructively amended.

### A. *The Sufficiency of the Evidence.*

In challenging the sufficiency of the evidence supporting his conviction, Jespersen bears "a very heavy burden." *United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir. 1989), *cert. denied*, 493 U.S. 1081, 495 U.S. 933, 958, 110 S.Ct. 1138, 2175, 2564, 107 L.Ed.2d 1043, 109 L.Ed.2d 504 (1990). His conviction must be upheld if " 'after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Resto*, 824 F.2d 210, 212 (2d Cir.1987) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in *Jackson* )). "[T]he reviewing court must draw all favorable inferences and resolve all issues of credibility in favor of the prosecution." *United States v. Khan*, 787 F.2d 28, 34 (2d Cir.1986).

■ Moreover, when reviewing the sufficiency of the evidence, the Supreme Court has made it clear that jury verdicts are not to be reviewed for consistency. *See United States v. Powell*, 469 U.S. 57, 61–69, 105 S.Ct. 471, 474–79, 83 L.Ed.2d 461 (1984) (holding that jury verdicts cannot be reviewed for consistency and affirming conviction when jury acquitted defendant of conspiracy to possess cocaine and possession of cocaine, but found her guilty of using the telephone to facilitate those offenses). *Powell* explained that "the Government's inability to invoke review, the general reluctance to inquire into the workings of the jury, and the possible exercise of lenity ... suggest that the best course to take is simply to insulate jury verdicts from review on this ground." *Id.* at 68–69, 105 S.Ct. at 479. Thus sufficiency of the evidence is reviewed independently for each count, ignoring "the jury's determination that evidence on another count was insufficient." *Id.* at 67, 105 S.Ct. at 478; *see also United States v. Acosta*, 17 F.3d 538, 545 (2d Cir.1994) ("The review of the legal sufficiency of the evidence with respect to one count should be independent of the jury's determination that the evidence on another count was insufficient to meet the government's burden of persuasion."). The jury acquittal of Jespersen on count one for accepting a gratuity is consequently irrelevant to our review of the sufficiency of the evidence supporting a conviction on count two (as is his acquittal on the false statement charge of count three).

■ Under these standards of review, the evidence adduced at trial was easily sufficient to support the conclusion that the Contract was not merely backdated, but fraudulently showed that Temerario had been paid for the work performed. No more need be said than that Temerario so testified, and that we are required to resolve any issue regarding his credibility in the government's favor. *Khan*, 787 F.2d at 34.

Jespersen sought a jury instruction, and continues to assert on appeal, that "the only

evidence before the Court is that the document was drafted in February or March of 1992," prior to issuance of the Subpoena on June 30, 1992. However, as noted earlier, a government witness, Philip Peyser, testified that in an April 15, 1993 interview, Norma Jespersen told him and Edward Zybul that she had requested that Temerario provide her with the Contract "as a result of the [S]ubpoena," and then stated more explicitly that she had asked Temerario for the Contract "after the [S]ubpoena had been issued." Temerario's testimony concerning when he created the Contract contradicts Peyser's recounting of Norma Jespersen's statement on this point.[3] Nevertheless, a reasonable jury could have inferred that Peyser's testimony about Norma Jespersen's admission was more believable than Temerario's testimony because the admission was damaging to the Jespersens' case, was unprompted, and was offered without the advice of counsel. Temerario, on the other hand, was clearly concerned about his own criminal liability in creating the Contract, had consulted counsel, and probably knew that testifying that he had created the Contract before the Subpoena was issued rather than afterwards would be beneficial to both the Jespersens' and his own cause. Given Peyser's uncross-examined testimony on this issue, the jury was free to infer, and we may assume for purposes of this appeal, that the Contract was created after the issuance of the Subpoena, although we do not regard such an assumption as essential for the affirmance of Jespersen's conviction.

Jespersen relies heavily upon this court's decision in *United States v. Moon,* 718 F.2d 1210, 1236 (2d Cir.1983), *cert. denied,* 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984), to support his claim that the evidence was insufficient to show his corrupt intent in producing the Contract to the grand jury. We believe, however, that *Moon* is clearly distinguishable.

That case involved the trial of Sun Myung Moon, the founder and spiritual leader of the Unification Church, and his advisor, Takeru Kamiyama. "Moon was charged basically with filing false income tax returns and Kamiyama with obstructing the investigation of those returns." *Id.* at 1215. The government contended principally that the income from certain bank accounts in Moon's name should have been reported on Moon's income tax returns for 1973, 1974, and 1975. Moon argued that the income was not so reportable because he had held the funds as a fiduciary for the Unification Church. *Id.* at 1216–17. Kamiyama was placed in charge of preparing Moon's tax return for 1973 in January 1974 after Moon was advised by outside counsel to keep his assets separate from those of the Unification Church and to file an individual income tax return. *Id.* at 1221. In order to claim that approximately $1.8 million held by Moon in the bank accounts actually belonged to the church, Kamiyama's aide created and backdated two fraudulent ledgers that detailed Unification Church sources for the deposit of these sums into Moon's accounts. *Id.* These ledgers were provided to the accountants who prepared Moon's 1974 and 1975 income tax returns, to the IRS in connection with its audit of Moon's returns, and in 1981 to government attorneys in response to a grand jury subpoena. *Id.* at 1222–23, 1236.

We reversed Kamiyama's conviction for violation of § 1503 as a result of producing the ledgers to the grand jury, responding favorably to his contention "that he [had] only submitted the [ledgers] to the grand jury because it had subpoenaed them and that there was insufficient evidence that he [had] intended to impede its investigation." *Id.* at 1236. In doing so, we said:

> There would be no problem ... had [the government] introduced proof before the petit jury to the effect that Kamiyama *had not only produced the questionable documents, but had also affirmatively vouched for their accuracy.* Similarly, the government's case would be more persuasive

---

**3.** Temerario indicated that he created the Contract in a room in his house which he was using for an office at the time he created the Contract. On July 23, 1992, when Jespersen visited Temerario, the visit occurred at Temerario's "new" office, which he estimated he had first occupied approximately two to three months prior to the visit, and therefore prior to the service of the Subpoena upon Jespersen on July 8, 1992.

were there any evidence that Kamiyama had submitted the documents with knowledge that, had he chosen, he could have resisted production on the grounds of self-incrimination....

... Were it not for the fact that the documents were subpoenaed, ... an inference [of corrupt intent] would doubtless have been permissible in this case. But here the ledger and loan agreements were produced pursuant to subpoena and even though there was ample proof of their being falsely backdated, there was no evidence of Kamiyama's corrupt intent in producing them. Whether or not Kamiyama could have resisted production, as the government argues, evidence of this government theory was not before the trial jury. Without it, a reasonable doubt as to Kamiyama's *mens rea* exists. Therefore, his [§ 1503] conviction must be reversed.

*Id.* at 1236 (emphasis added).

■ *Moon* did not rule, of course, that a § 1503 conviction could not result from the production of documents in response to a grand jury subpoena. It held only that proof of a corrupt intent was not established in that case, and pointed to the specific sorts of proof that would have allowed Kamiyama's § 1503 conviction to be affirmed. Such proof was provided in this case.

In the first place, the ledgers at issue in *Moon* were created years before the grand jury investigation that resulted in their production pursuant to a grand jury subpoena. The generation of the ledgers commenced in January 1974. *See* 718 F.2d at 1221. The grand jury in question was "the June 1980 Additional Grand Jury for the Southern District of New York," *id.* at 1237, and Kamiyama was notified in the spring of 1981 that he was a target of the grand jury investigation. *See United States v. Moon,* 532 F.Supp. 1360, 1372 (S.D.N.Y.1982); *see also United States v. McComb,* 744 F.2d 555, 562 n. 6 (7th Cir.1984) (distinguishing *Moon* because, *inter alia,* "the documents had been altered long before they were subpoenaed").

4. We therefore need not address the issue whether Jespersen was entitled not to produce the Contract because of the privilege against self-incrimination. Jespersen contends that *Fisher v.*

Here, by contrast, as in *McComb,* "the jury could have found that the defendant's falsification of records was done for the express purpose of impeding the investigation." *Id.* It is clear that the grand jury investigation of the IRS Center was already underway when Zybul first interviewed Jespersen in February 1992, and the jury was entitled to infer that Jespersen was aware of the investigation at least by that time. According to Temerario's account, Jespersen procured the Contract from Temerario in explicit response to Zybul's questions about the improvements to Jespersen's home, and Jespersen had to have procured his wife's signature to the Contract before producing it in response to the Subpoena. If Peyser's testimony concerning Norma Jespersen's admissions is accepted, both the creation of the Contract, its signature by Temerario and Norma Jespersen, and its production to the grand jury occurred not only in awareness of the grand jury investigation, but in explicit response to the Subpoena.

Further, Temerario's testimony (which we must credit on this sufficiency review) establishes that Jespersen undertook to "affirmatively vouch[ ] for [the] accuracy" of the Contract. *Moon,* 718 F.2d at 1236. According to Temerario, the same day that Jespersen produced the Contract to the grand jury, he descended upon Temerario, who was certain to be called as a grand jury witness, and implored him to vouchsafe the legitimacy of the Contract and to verify the payments to Temerario by the Jespersens that it recited. *Cf. United States v. Buffalano,* 727 F.2d 50, 53 (2d Cir.1984) (a forbidden § 1503 "endeavor" includes " 'any effort or essay to accomplish the evil purpose that the section was enacted to prevent' ") (quoting *United States v. Russell,* 255 U.S. 138, 143, 41 S.Ct. 260, 261, 65 L.Ed. 553 (1921)).

Thus, on this record, as distinguished from *Moon,* the sufficiency of the evidence to establish the corrupt intent required by § 1503 is clear.[4] Nor does the Supreme Court's

*United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), compelled production of the Contract. This is not at all clear. *Fisher* addressed a taxpayer's privilege with respect to

very recent decision in *United States v. Aguilar,* —— U.S. ——, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995), call for a different result. In that case, the Court ruled that a casual reference to a sitting grand jury in the course of a future defendant's interview by an FBI agent did not render statements made in that interview a violation of § 1503 on the basis that they were likely to be repeated by the agent to the grand jury. *See id.* at ——–——, 115 S.Ct. at 2362–63. The Court explicitly acknowledged, however, that "statements ... made directly to the grand jury itself, in the form of false testimony *or false documents,*" provide a basis for § 1503 liability. *Id.* at —— & n. 2, 115 S.Ct. at 2363 & n. 2 (emphasis added) (collecting cases).

█ Finally, in addition to contending that the evidence was insufficient to establish the corrupt intent required for a violation of § 1503, Jespersen argues that there was insufficient evidence of the required "nexus", *see id.* at ——, 115 S.Ct. at 2362, between the Contract and the alleged endeavor by Jespersen to impede the grand jury. This argument rests upon the discredited premise that the jury verdict on count one requires us to regard the recitals of payment in the Contract as truthful. In any event, all that need be shown is that the Contract "had the natural and probable effect of impeding justice," *United States v. Thomas,* 916 F.2d 647, 652 (11th Cir.1990); *see also Aguilar,* —— U.S. at ——, 115 S.Ct. at 2362, and it is clear that if the representations embodied in the Contract had been believed, the grand jury would have been thrown completely off the trail that it was pursuing with respect to Jespersen.

B. *Constructive Amendment of the Indictment.*

█ Count two of the indictment alleges that Jespersen "did knowingly and wilfully

obstruct and impede and endeavor to obstruct and impede the due administration of justice by creating and producing and causing to be created and produced a false document in response to a subpoena." Judge Spatt's charge to the jury, however, permitted conviction premised only upon "submission" of the false document, without reference to its creation.

It is well settled that an indictment is impermissibly amended when there is a "variation between the charges in the indictment and the evidence at trial that 'broadens the basis of conviction beyond that charged in the indictment.'" *United States v. Rosenthal,* 9 F.3d 1016, 1021 (2d Cir.1993) (quoting *United States v. Patino,* 962 F.2d 263, 265 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 354, 121 L.Ed.2d 268 (1992) (citing *United States v. Miller,* 471 U.S. 130, 144–45, 105 S.Ct. 1811, 1819–20, 85 L.Ed.2d 99 (1985))). However, " 'we have "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the 'core of criminality' to be proven at trial." ' " *Id.* at 1021–22 (quoting *Patino,* 962 F.2d at 266 (quoting *United States v. Heimann,* 705 F.2d 662, 666 (2d Cir.1983) (quoting *United States v. Sindona,* 636 F.2d 792, 797 (2d Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981)))). To be impermissible, the "alteration ... must affect an essential element of the offense." *Patino,* 962 F.2d at 266.

As we explained in *Rosenthal,* "[w]hile it is the Government's burden to prove the essential elements of a charged crime, allegations in an indictment that go beyond the essential elements which are required for conviction do not increase the Government's burden." 9 F.3d at 1023 (permitting jury charge on gratuity count which did not require that the thing of value offered be "false and fraudulent" since not required under relevant statute, although such language was included in

---

accountants' workpapers that were subpoenaed from the taxpayer's attorney, *id.* at 393–94, 96 S.Ct. at 1572–73, a situation hardly on all fours with this case. *Cf. In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992 (United States v. John Doe),* 1 F.3d 87, 93 (2d Cir.1993) (production may not be required " 'if the existence and location of the subpoenaed papers are unknown to the government' ") (quoting *United*

*States v. Fox,* 721 F.2d 32, 36 (2d Cir.1983)), *cert. denied,* —— U.S. ——, 114 S.Ct. 920, 127 L.Ed.2d 214 (1994). In any event, no compulsion was required to motivate Jespersen to put the Contract in the hands of the grand jury. The jury was entitled to conclude that Jespersen was determined to do precisely that in an attempt to exonerate himself, whatever privilege he might have had to forgo that action.

indictment). This principle was further illuminated in *United States v. Mucciante*, 21 F.3d 1228 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 361, 130 L.Ed.2d 315 (1994), in which we stated:

> In *United States v. Miller*, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985), the Supreme Court distinguished the doctrine of constructive amendment (where the proof adduced at trial expands the basis of the indictment) from cases in which "a defendant is tried under an indictment that alleges a certain fraudulent scheme but is convicted based on trial proof that supports only a significantly narrower and more limited, though included, fraudulent scheme." *Id.* at 131, 105 S.Ct. at 1812. The Court held that a defendant's constitutional rights are not violated when a jury convicts a defendant for a narrower, though included, fraudulent scheme. *Id.*

*Id.* at 1235–36 (sustaining jury instruction which permitted conviction for defrauding only one person where grand jury indicted for defrauding three persons). "As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." *Miller*, 471 U.S. at 136, 105 S.Ct. at 1815 (collecting cases).[5]

 A conviction for obstruction under § 1503 requires only that an act be done "corruptly ... [with the intent] to influence, obstruct, or impede, the due administration of justice." *See supra* note 1. Nothing therein requires that where obstruction is caused by production of a false document to a grand jury in response to a subpoena, the document must be created in response to the subpoena. *See Aguilar*, —— U.S. at —— & n. 2, 115 S.Ct. at 2362 & n. 2 (provision of "false documents" to grand jury provides basis for § 1503 liability) (collecting cases).

## Conclusion

The judgment of the district court is affirmed.

---

5. Jespersen invokes *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), but in that case the proof at trial clearly broadened, rather than narrowed (as here), the basis for the defendant's conviction. The invocation of *Sti-rone* is consistent with Jespersen's somewhat Orwellian contention that a conviction for producing, rather than creating and producing, the Contract somehow "broadened" the grounds charged in the indictment.