18-3294-cr (L)
*United States v. Eldridge*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 22nd day of June, two thousand twenty.

Present:
> DENNY CHIN,
> RICHARD J. SULLIVAN,
> WILLIAM J. NARDINI,
> *Circuit Judges*.

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.                                                           18-3294-cr (L), 19-92-cr (Con)

THAMUD ELDRIDGE, KEVIN ALLEN,

*Defendants-Appellants,*

KASHIKA SPEED, GALEN ROSE,

*Defendants*.[1]

_____

| For Defendant-Appellant Thamud Eldridge: | DEVIN MCLAUGHLIN, Langrock Sperry & Wool, LLP, Middlebury, VT |

---

[1] The Clerk of Court is directed to amend the caption as set forth above.

| | |
|---|---|
| For Defendant-Appellant<br>Kevin Allen: | CHERYL M. BUTH, Meyers Buth Law Group, Orchard Park, NY |
| | |
| For Appellee: | KATHERINE A. GREGORY, Assistant United States Attorney, *for* James P. Kennedy, Jr., United States Attorney for the Western District of New York, Buffalo, NY |

Appeal from judgments of the United States District Court for the Western District of New York (Richard J. Arcara, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgments of conviction and sentences are **AFFIRMED**.

Defendants-Appellants Thamud Eldridge and Kevin Allen appeal from their convictions and sentences for narcotics and firearms offenses, as well as for violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act. In a concurrently filed opinion, we (1) reject the defendants' claim that they were denied a fair trial due to a curtain around the defense table; (2) find no plain error in the court's instructional error on Count Seven against Eldridge for possessing and brandishing a gun in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c); and (3) hold that Section 403(a) of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5221–22, does not apply to Eldridge. In this summary order, we conclude that none of the defendants' remaining challenges warrants reversal. We assume the reader's familiarity with the record.

## I. Fair Trial Claims

### A. Partial closure of the courtroom

The defendants claim that they were denied their right to a public trial when law enforcement officers in the courtroom asked for identification from the defendants' family members on one afternoon during trial. The district court denied the defendants' motion for a mistrial based in part on these actions, concluding that the Government's reason for the officers' actions—that some witnesses had reported receiving threats following opening statements—justified the narrow closure.

We find no error in the district court's ruling. The Supreme Court has acknowledged that the Sixth Amendment right to a public trial is not absolute and that circumstances may require closing the courtroom to protect other interests. *See Waller v. Georgia*, 467 U.S. 39, 45 (1984). To justify a courtroom closure, the law requires that: (1) "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced," (2) "the closure must be no broader than necessary to protect that interest," (3) "the trial court must consider reasonable alternatives to closing the proceeding," and (4) "it must make findings adequate to support the closure." *Id.* at 48. Where the courtroom is only partially closed, the first requirement is relaxed, requiring a "substantial reason" rather than "overriding interest" supporting the closure. *See United States v. Smith*, 426 F.3d 567, 571 (2d Cir. 2005) (internal quotation marks omitted).

3

We have previously applied *Waller* to hold that law enforcement's request for courtroom spectators' identification in response to reasonable security concerns effected a partial closure of the courtroom, but one that did not violate the defendants' rights to a public trial. *See id.* at 572–73. We conclude the same here. The closure was narrow in scope and time, occurring on only one afternoon of trial and purportedly keeping only one spectator from attending the trial that day. Moreover, as the district court found, there was a "positive correlation" between the partial closure and the substantial interest at stake. Allen App'x at 149 (district court's decision, quoting *Smith*, 426 F.3d at 573). The court's inference that courtroom spectators could have been the source of threats made to witnesses—witnesses who had been named for the first time that morning during trial—was entirely reasonable, and the partial closure reasonably advanced the public interest in preventing further tampering by deterring such conduct or aiding in a subsequent investigation. Thus, this short-lived partial closure was justified.

**B. Questioning the jury**

The defendants challenge the district court's decision to question the entire panel of jurors at once about potential fears over their security, rather than conducting individual inquiries. We review a district court's findings concerning jury impartiality for abuse of discretion, with the court having "broad flexibility in such matters, especially when the alleged prejudice results from statements by the jurors themselves." *United States v. Haynes*, 729 F.3d 178, 192 (2d Cir. 2013) (quoting *United States v. Thai*, 29 F.3d 785,

4

803 (2d Cir. 1994)). We find no abuse of discretion here. After learning that one juror had voiced concerns to the courtroom deputy about the defendants' access to the jurors' personal information, the district court conducted a thorough inquiry of the jury to determine whether there was a risk of prejudice before issuing a cautionary instruction to the jury on its obligation to be fair and impartial. The defendants do not offer any reason beyond speculation to suspect that the procedure used by the district court here was inadequate to ensure an impartial jury.

## C. Prosecutorial misconduct

Eldridge alone alleges that prosecutorial misconduct infringed his right to a fair trial; however, Eldridge did not raise this challenge before the district court, and so we review his claim for plain error. *See Johnson v. United States*, 520 U.S. 461, 466–67 (1997) (holding reversal appropriate only if there was "(1) error, (2) that is plain, and (3) that affects substantial rights," and only when "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings" (internal quotation marks and alterations omitted)).

To warrant a new trial, the alleged prosecutorial misconduct "must be so severe and significant as to result in the denial of [the defendant's] right to a fair trial." *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) (quoting *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993)). Eldridge asserts that three instances of alleged misconduct meet this standard: first, that the prosecutor knew that testimony about when a witness named

5

Jackson met Eldridge was false yet left it uncorrected; second, that the prosecutor's opening statement misled the jury as to evidence it would hear linking a cigar butt found at the scene of a charged armed robbery to the gunman; and third, that the prosecutor improperly solicited statements from a witness regarding Eldridge having previously been shot.   We disagree, seeing no basis to conclude that Eldridge's right to a fair trial was violated.

With respect to the purportedly false and uncorrected testimony, Eldridge has not demonstrated that the false statement was intentional, as opposed to the result of mistaken memory.   *See United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009) (stating that "[d]ifferences in recollection do not constitute perjury").   Even assuming the false statement was intentional (and that the prosecutor was aware of the statement's falsity), the record does not support a finding that the falsehood was material to the jury's verdict. *See id.*   Eldridge does not suggest that the year he met Jackson was material to guilt; he only asserts that had the misstatement been made known to the jury, "Jackson's credibility would have been shot."   Eldridge Br. at 47.   But the discrepancy—if there was one—presumably would have been known to the defense, too, and yet Eldridge declined to cross-examine Jackson on it, leaving Jackson's credibility undisturbed. Eldridge therefore has not demonstrated that the prosecution's failure to correct Jackson's testimony is now grounds for reversal.

6

Next, there was no misconduct in the prosecution's opening statement concerning the cigar-butt evidence because, at the time of the statement, the prosecution had a good faith basis to believe that the evidence linking the cigar butt to the gunman could be admitted pursuant to a hearsay exception. After the prosecution failed to adduce the requisite foundation for the testimony, it did not revisit the statement in summation. Moreover, any error would have been harmless because the defense summation highlighted the prosecution's failure to produce a witness to testify that the gunman had a cigar, and the district court issued limiting instructions to the jury concerning statements made during opening and closing statements. *Cf. United States v. Millar*, 79 F.3d 338, 343 (2d Cir. 1996) (unintentionality of prosecutor's misstatement is factor to be considered in evaluating misconduct); *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir. 2010) (efforts made to cure the misconduct considered when determining whether misconduct amounts to prejudicial error).

Last, Eldridge claims that it was misconduct for the prosecution to solicit testimony that Eldridge had previously been shot because the testimony violated the district court's pre-trial order excluding such evidence under Federal Rule of Evidence 403. We need not reach this question since any hypothetical error was harmless in light of the overwhelming evidence that Eldridge was a member of a gang, carried a gun, sold drugs, and committed robberies and other violent acts. *See United States v. McCarthy*, 54 F.3d 51, 55 (2d Cir. 1995) ("When prosecutorial misconduct is alleged, a new trial is only

warranted if the misconduct is of sufficient significance to result in the denial of the defendant's right to a fair trial." (internal quotation marks omitted)).

## II.    Eldridge's Speedy Trial Claim

Eldridge claims that he was denied a speedy trial under the Sixth Amendment, arguing that the approximately six-year interval between his indictment in September 2009 and the commencement of trial in January 2016 was presumptively prejudicial, that the prosecution caused the delay, and that the destruction of some trial evidence during the delay prejudiced his case.    We consider four factors when considering claims of a constitutional speedy trial violation—the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant," *Barker v. Wingo*, 407 U.S. 514, 530 (1972)—none of which has "talismanic qualities," *id.* at 533.    Here, the Government concedes that a six-year delay is presumptively prejudicial, while Eldridge acknowledges that he did not expressly invoke his speedy trial rights before the district court.    Since a presumptively prejudicial delay "cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria," *Doggett v. United States*, 505 U.S. 647, 656 (1992), Eldridge's claim turns primarily on the causes of the delay and the extent to which the delay in fact prejudiced Eldridge.

The delay here did not violate Eldridge's right to a speedy trial.    A significant portion, if not a substantial majority, of the delay was attributable to the defendants.    For example, at least ten months can be traced to Eldridge's motion to recuse the entire U.S.

8

Attorney's Office.    Several of the Government's motions for extensions of time were responses to the defendants' motions to bifurcate the proceedings.    And the Government's motions regarding the spoliation of evidence were pending at the same time as various defense motions.    Moreover, we see nothing problematic in the "neutral" reason for delay, namely the use of a magistrate judge for certain proceedings.

Furthermore, the delay did not prejudice Eldridge in any meaningful way.    When evaluating prejudice, we look to "the interests of defendants which the speedy trial right was designed to protect," namely "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility the defense will be impaired."    *Barker*, 407 U.S. at 532.    Here, Eldridge was already serving the remainder of another sentence during the first three years and three months following his indictment, and he did not argue that he suffered any particular anxiety.    Nor was his defense impaired.    Although he lost one of his original attorneys, that was because his lawyer was not eligible to practice in the Western District of New York and had nothing to do with the passage of time.    The loss of evidence during the delay almost certainly redounded to Eldridge's benefit: the witness who had linked the gunman at 87 Girard to the cigar butt with Eldridge's DNA on it died prior to trial, leaving the prosecution unable to directly connect Eldridge to that offense.    On balance, Eldridge did not suffer a violation of his speedy trial rights.

## III.    Sufficiency of Evidence

The defendants challenge the sufficiency of the evidence as to: (1) the existence of a racketeering enterprise; (2) a pattern of racketeering activity; and (3) a narcotics conspiracy (Racketeering Act One and Count Three).   Eldridge additionally challenges the sufficiency of the evidence for: (4) the attempted robbery of 87 Girard (Racketeering Act Two); (5) the RICO conspiracy (Count Two); and (6) the possession of a firearm in furtherance of a drug trafficking crime (Count Four).   Allen challenges the sufficiency of the evidence for (7) his participation in a conspiracy to rob Woodie Johnson (Count Six).

In reviewing the sufficiency of the evidence supporting a jury's verdict, "the reviewing court is required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury verdict."   *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011).   Direct testimony to a fact is sufficient to support a finding on that fact, and where there was such testimony, we will assume the jury credited it.   *See United States v. Jespersen*, 65 F.3d 993, 998 (2d Cir. 1995).   In light of this standard, we conclude that the Government adduced sufficient evidence on each of the challenged points.

First, there was sufficient evidence of an "association-in-fact" racketeering enterprise, which "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."   *Boyle v. United States*, 556 U.S. 938, 946

10

(2009). The Government's evidence showed that: Allen, Eldridge, and co-defendant Kashika Speed met frequently to plan and commit robberies of other drug dealers; Allen and Eldridge traveled together to Atlanta to acquire drugs and guns after the robberies; and the three were closely linked to, if not formally affiliated with, the Montana Bridge and Newburgh crews, which were themselves essentially one gang split generationally. A jury could reasonably have concluded that the defendants constituted an ongoing enterprise during the charged period of criminal activity, with a shared purpose of selling drugs and committing robberies to enrich the group.

Second, evidence of the two robberies clearly showed a pattern of racketeering activity and supported the narcotics conspiracy: the robbery of Woodie Johnson concluded with the defendants splitting up the stolen cocaine for distribution, while the attempted robbery of 87 Girard targeted a known drug house. The jury also heard testimony that the defendants robbed drug dealers because it was a way to obtain drugs "wholesale" for the defendants to then distribute. Because there was ample evidence that the defendants committed these predicate crimes, and that the crimes were sufficiently related, Allen's related challenge to the pattern is meritless.

Third, with respect to the narcotics conspiracy charged in Racketeering Act One and Count Three, the defendants argue that the Government proved only instances of individual dealing. This claim is undermined by substantial evidence introduced at trial, including that the defendants not only planned to rob drug dealers with the intent

11

of acquiring drugs "wholesale" for distribution, but actually did so when robbing Woodie Johnson and divvying up the proceeds.

Fourth, we reject Eldridge's challenge to his conviction for the attempted robbery of 87 Girard Street charged in Racketeering Act Two. Eldridge argues that the Government failed to show that he was present at the robbery or that any robbery was actually attempted, but the jury could reasonably have inferred that Eldridge was present in the house during the robbery based on (1) the recovered cigar butt with Eldridge's DNA on it and (2) the homeowner's testimony that he did not know Eldridge and had never given him permission to enter the house. Similarly, the jury could have inferred that the assailants were attempting a robbery based on the evidence, which showed that the house was owned by a known drug dealer, the assailants were armed, and they tied up victims at the house. These facts support an inference of the requisite intent to take property sufficient to support a conviction.

Fifth, Eldridge challenges the sufficiency of the evidence underlying his conviction for the RICO conspiracy charged in Count Two; however, his argument is based entirely on the arguments rejected above concerning the lack of evidence of a racketeering enterprise or pattern of racketeering activity. Because we disagree with Eldridge that the Government failed to adduce sufficient evidence on either of those elements, we likewise reject his challenge to his conviction for RICO conspiracy.

Sixth, we reject Eldridge's challenge to the sufficiency of the evidence supporting his conviction on Count Four for possessing a firearm in furtherance of a drug trafficking crime. Eldridge himself admits that there is "marginal" evidence that he possessed a firearm, but he nonetheless argues that the Government failed to prove the requisite nexus between that firearm possession and any drug trafficking crime. However, the jury heard ample testimony indicating that Eldridge was armed while obtaining or dealing drugs. For example, Renfro testified that Eldridge carried a gun "[e]very time, every day, all the day," including when Renfro "would drop him off and [Eldridge] would sell drugs." Tr. at 682–83. Moreover, as noted above, the jury heard testimony that Eldridge and Allen together went to Atlanta to acquire drugs and guns. Thus, the evidence was sufficient to support the jury's conviction on Count Four.

Finally, Allen's challenge to the sufficiency of the evidence supporting his conviction for conspiracy to rob Woodie Johnson is meritless. A witness testified that he had attended a meeting where Allen, Eldridge, and Speed planned the robbery. Allen points to inconsistencies between that witness's testimony and that of other witnesses, but the jury was entitled to resolve those inconsistencies in favor of crediting the former.

## IV. Jury Instructions

Eldridge raises two challenges to the jury instructions on his § 924(c) convictions. He first argues that the court's instruction as to aiding and abetting was insufficient

13

because the court did not include any language concerning "advance knowledge" of the presence of a firearm, as required under *Rosemond v. United States*, 572 U.S. 65 (2014). *See United States v. Prado*, 815 F.3d 93, 100–02 (2d Cir. 2016). Second, Eldridge challenges the district court's failure to specifically "instruct the jury that they were not to find liability on the multiple [§] 924(c) counts for the same predicate conduct." Eldridge Br. at 42. "We review challenges to jury instructions *de novo* but will reverse only where the charge, viewed as a whole, demonstrates prejudicial error. A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Prado*, 815 F.3d at 100 (internal quotation marks and citation omitted). Because Eldridge did not object to the instructions below, we review for plain error.

On Eldridge's first claim, we agree—and the Government does not dispute—that the district court failed to instruct the jury that advance knowledge of the firearm was necessary to sustain a conviction for secondary liability as required under *Rosemond*. However, Eldridge fails to demonstrate, as he must under plain error review, that he was prejudiced by this error. There was ample evidence that Eldridge himself possessed a firearm in connection with the charged drug trafficking. Eldridge provides no reason to conclude that the jury's verdict turned on a finding that he acted as an accessory in Counts Four and Seven, much less a showing that the specific failure to instruct the jury on advance knowledge prejudiced him.

14

We also reject Eldridge's claim that it was plain error for the district court to fail to specifically instruct the jury that Eldridge could not be convicted of both § 924(c) counts based on the same underlying conduct. Even assuming that the district court did err—and the Government does not argue otherwise—Eldridge cannot show that he was prejudiced by the lack of such an instruction. Eldridge may be correct that the jury conceivably could have treated the Johnson robbery specified in Count Seven as part of the drug trafficking activities stated in Count Four and thus convicted him of both counts based on a single incident—the Johnson robbery. But conceivably is not enough; he bears the burden of showing that there was a "reasonable probability" that, if the court had provided the requested instruction, the jury would not have convicted him on both Counts Four and Seven. *Prado*, 815 F.3d at 103. Here, the jury had substantial evidence that Eldridge possessed a firearm while engaging in a number of drug trafficking activities other than the Johnson incident; there is no reason to think that a more detailed instruction on the separate § 924(c) counts would have changed the verdict. *See United States v. Arline*, 835 F.3d 277, 282–83 (2d Cir. 2016) (finding no plain error where district court did not instruct the jury that two § 924(c) counts could not be predicated on the same conduct, in light of ample evidence showing that the defendant "possessed multiple firearms on separate occasions").

15

## V. Sentencing Challenges

Next, we address Eldridge's three challenges to his sentence, which together, he claims, amount to procedural error. First, he argues that the district court erred when calculating his criminal history under the Sentencing Guidelines; second, he claims the court erred in failing to apply an adjustment pursuant to § 5G1.3(b) of the Guidelines; and third, he argues that the record did not support the drug quantity attributed to him.

A sentencing court commits procedural error if it, *inter alia*, "is mistaken in the Guidelines calculation . . . [or] makes clearly erroneous factual findings." *United States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009). "However, where we identify procedural error in a sentence, but the record indicates clearly that the district court would have imposed the same sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing." *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015) (internal quotation marks and alteration omitted). We review the application of the Guidelines *de novo* and the factual determinations underlying the calculation of the Guidelines range for clear error. *See United States v. Rowland*, 826 F.3d 100, 116 (2d Cir. 2016).

We see no reason to disturb Eldridge's sentence. First, we find no grounds to remand for resentencing with respect to the district court's calculation of the Guidelines. The court properly declined to count Eldridge's state forgery conviction as relevant conduct (as opposed to criminal history), since the conviction could not serve as a

16

racketeering predicate, and Eldridge did not offer any facts that would connect the forgery conviction to Eldridge's crimes in this case. And, even if the court should have excluded Eldridge's 2009 federal convictions from his criminal-history calculation, any procedural error was harmless. Eldridge's dispute is basically over a five-month difference in the low end of the Guidelines range for Counts One, Two, and Six. Under his view, the court should have considered a range of 235–240 months, rather than a fixed "range" where both the minimum and maximum were 240 months. But the record is clear that the district court—having considered the § 3553(a) factors, the competing Guidelines ranges offered by the Government and Eldridge, and the length of the aggregate sentence it was going to impose—decided to impose a non-Guidelines sentence on Count Five. The court was free to choose any sentence from zero to life on this count, and it chose a sentence of 240 months. Because Eldridge's sentence for Count Five runs concurrently with and for the same length of time as the counts that Eldridge claims were subject to procedural error (Counts One, Two, and Six), any mistake the district court might have made when calculating the Guidelines with respect to those disputed counts could not have had any effect on the total length of Eldridge's sentence. Thus, any error was harmless. *See United States v. Blount*, 291 F.3d 201, 214 (2d Cir. 2002) (finding sentencing error on individual counts did not prejudice the defendant under plain error review, where "[t]he correct aggregate sentence would thus have been a prison term identical to the sentence that was in fact imposed").

Next, we disagree with Eldridge's argument that he was entitled to an adjustment pursuant to U.S.S.G. § 5G1.3(b) based on his characterization of the above-described 2009 convictions and his state forgery conviction. Section 5G1.3(b), by its plain language, applies only to "undischarged term[s] of imprisonment." Eldridge completed his sentence for these convictions in 2012—well before his sentence in this case was imposed—so his prior term of imprisonment was not "undischarged." Eldridge was not eligible for this adjustment.

Finally, we find that the district court did not clearly err in its determination of the drug quantity attributable to Eldridge for purposes of calculating his base offense level. There was ample testimony supporting the district court's implicit finding that the Montana Bridge and Newburgh gangs were intertwined, and thus the district court could rightly attribute their sales to Eldridge. The record likewise contains sufficient evidence, including the testimony of Jermone Laster, to support the calculated weekly sales quantity. In any event, the record is replete with evidence on which the district court could have based its calculated quantity of between 3,000 and 10,000 kilograms of marijuana even excluding the weekly sales of the Montana Bridge gang. For these reasons, we conclude that the district court did not clearly err in its calculation of the drug quantity.

## VI.     Eldridge's *Pro Se* Claim

Eldridge, acting *pro se*, separately challenges his conviction by arguing that he was deprived of a fair trial because the district court judge took on the role of the prosecutor and denied defense counsel the opportunity to impeach a witness.    In reviewing such a challenge, this Court will reverse only where "the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, tr[ia]l."     *United States v. Amiel*, 95 F.3d 135, 146 (2d Cir. 1996) (citation omitted).    "The test is whether the jury was so impressed with the judge's partiality to the prosecution that it became a factor in determining the defendant's guilt, or whether it appeared clear to the jury that the court believed the accused is guilty."     *Id.* (internal quotation marks and alteration omitted). Based on the record before us, the district court did not take on the role of the prosecutor during the cross-examination of the witness in question, Cuyler.    Contrary to Eldridge's characterization, the district court did not object on the prosecutor's behalf.    The record reflects that after a colloquy in which the court sustained several of the prosecution's objections, defense counsel persisted on the same line of questioning; it was only then that the judge asked the prosecution if it was objecting, at which point the judge again sustained the objection.    There was nothing improper with this exchange.    *See United States v. Pisani*, 773 F.2d 397, 403–04 (2d Cir. 1985) (finding no violation of a defendant's fair trial right where the judge questioned defense witnesses and made comments to defense counsel, at least some of which "were provoked by counsel's continuing to do

19

things that the court had specifically cautioned" against). Further, the district court's statement that defense counsel's questioning would be limited based on whether Cuyler's recollection was refreshed was not "leading" Cuyler, but rather an evidentiary ruling. In any event, Eldridge has failed to show how the district court's actions prejudiced him. Eldridge does not explain why Cuyler's testimony was critical to the jury's verdict, nor does he link Cuyler's testimony to any specific count or critical piece of evidence. He merely points to a single incident during a weeks-long trial, which cannot support his claim. Eldridge has thus failed to show that the judge's actions deprived him of a fair trial.

*　　*　　*

We have considered the defendants' remaining arguments and find them to be without merit. Accordingly, for the foregoing reasons as well as those in the accompanying opinion, we **AFFIRM** the defendants' convictions and sentences.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

20